George C. HIBMA, Plaintiff-Appellant,

v.

Richard T. ODEGAARD, James Nikodem, and Michael Paul Szula, Defendants-Appellees,

and

Sawyer County, Wisconsin, Intervening Defendant-Appellee.

Nos. 84–1137, 84–1445.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 30, 1984.

Decided July 30, 1985.

Eric J. Wahl, Eau Claire, Wis., for plaintiff-appellant.

Richard C. Niess, Madison, Wis., for defendants-appellees.

Before CUDAHY and COFFEY, Circuit Judges, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

Plaintiff-Appellant, Hibma, appeals the trial court's granting of intervening Defendant-Appellee's, Sawyer County's, motion for judgment notwithstanding the verdict, the trial court's denial of Hibma's motions to increase the jury's award of damages or, alternatively, for a new trial on the issue of damages, and the trial court's award of attorney's fees under 42 U.S.C. § 1988. For the reasons stated below, this Court reverses the trial court's order granting judgment notwithstanding the verdict and affirms the trial court's decision in all other respects.

### Facts

During the time relevant to this action, Sawyer County employed Defendants-Appellees, Nikodem, Szula and Odegaard. Odegaard served as full-time Chief Deputy Sheriff of Sawyer County, and the other

---

* Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, sitting by designation.

two served as full-time deputy sheriffs. After having committed a series of burglaries in Sawyer County, the three deputies plotted to frame Hibma for their crimes. They chose Hibma because he had a prior burglary conviction and also because he worked as a carpenter for the son of the Sheriff of Sawyer County, Sheriff Lien, whom the deputies hoped to discredit. The deputies disliked Sheriff Lien and had previously attempted to poison him with lysergic acid diethylamide (LSD) and to murder him by redirecting the exhaust system of his squad car into the heater.

The deputies solicited the help of one Proffitt, a Sawyer County Jail inmate serving time under a work release sentence for forgery. They promised Proffitt that he would receive favorable treatment on his sentence if he could talk Hibma into stealing a hand gun which Proffitt would supposedly fence.

Proffitt did contact Hibma several times over the next couple of weeks and eventually convinced him to steal a particular gun from one of Hibma's construction sites. Hibma stole the gun and delivered it to Proffitt who transferred it to the deputies. When Hibma met with Proffitt to divide the proceeds of the sale, the deputies arrested him, at gun point, for suspicion of burglary and theft. They searched Hibma, handcuffed him and took him to the Sawyer County Jail.

The deputies placed Hibma in Chief Deputy Odegaard's office and questioned him about the handgun theft as well as unsolved Sawyer County burglaries, including those that they themselves had committed. Hibma admitted the handgun theft, but denied any involvement in the burglaries. The deputies ignored Hibma's request for an attorney and refused his entreaty for medical treatment. Hibma, a narcoleptic, was physically dependent on various legal and illegal stimulant drugs. He needed medical attention because he was beginning to go through stimulant withdrawal. The deputies booked Hibma, strip searched him, gave him a cold shower and a jail uniform, and locked him in a holding cell.

Over the next several hours, the deputies repeatedly interrogated Hibma as Hibma's drug withdrawal made him violently ill. Hibma finally consented to a search of his residence.

Upon searching Hibma's home, the Sawyer County Sheriff's Department claimed to find property stolen by Odegaard, Nikodem and Szula which the three had planted in Hibma's house earlier. The deputies confronted Hibma with the stolen property and tried to coerce him into confessing to their burglaries. They again ignored his plea for medical help and left him in the holding cell when he refused to confess.

Hibma, in order to draw attention to his medical condition, broke his eyeglasses and superficially cut his wrist. The jailor summoned a doctor who obtained a court order to transfer Hibma to a hospital for drug dependency treatment. Sawyer County Jail transferred Hibma sixteen hours after his arrest. Chief Deputy Sheriff Odegaard ordered that he be transported in full restraints and that the trip be prolonged.

On the day that Hibma was moved to the hospital, Nikodem filed investigative and administrative reports which concluded that Hibma had perpetrated many of the unsolved Sawyer County burglaries. Szula swore out a criminal complaint accusing Hibma of the burglaries.

After a month in a drug treatment program, Hibma was returned to the Sawyer County Jail. On June 29, 1977, he pled guilty to the theft of the handgun pursuant to a plea agreement under which the burglary charges were dismissed. Odegaard testified against Hibma at the plea hearing. Hibma received a two-year sentence in a maximum security prison in Green Bay, Wisconsin. After two inmates sexually assaulted Hibma in Green Bay, he was transferred to another prison. He actually served a year and a day of his sentence.

In 1980, two years after Hibma's release from prison, the Federal Bureau of Investigation instigated a probe into certain activities in Sawyer County. The FBI investigation eventually led to the convictions of

Odegaard, Nikodem and Szula on various federal criminal charges as well as conspiring to frame Hibma for their crimes.

In 1982, Hibma then filed the present action under 42 U.S.C. § 1983. In August 1983, Nikodem and Szula stipulated that they entrapped Hibma and that he would not have gone to prison but for the entrapment. Sawyer County intervened because it was potentially liable, by way of indemnification, for the acts of the deputies which were done within the scope of their employment. Wis.Stat.Ann. § 895.46 (West Supp. 1983). After a three and one-half day trial, the jury awarded Hibma $166,500.00 for damages suffered by the actions of the deputies which they did under color of state law, and attributed $86,500 of that sum to acts performed in the scope of the deputies' employment. On January 5, 1984, the district court, 576 F.Supp. 1549, granted judgment notwithstanding the verdict to Sawyer County finding that all acts of the deputies were outside the scope of their employment under Wisconsin law. The district court also denied Hibma's motion for attorney's fees from the county, but granted attorney's fees from the individual deputies.

### Issues

Hibma presents three issues on appeal:

I. Whether Odegaard, Nikodem and Szula acted within the scope of their employment when they violated Hibma's constitutional rights;

II. Whether the trial court erred in denying Hibma's post-trial motions to increase damages or alternatively for a new trial on the issue of damages; and,

III. Whether 42 U.S.C. § 1988 entitles Hibma to an award of all his attorney's fees and costs?

Issue I. **Whether Odegaard, Nikodem and Szula acted within the scope of their employment when they violated Hibma's constitutional rights?**

Wis.Stat. § 895.46 provides in pertinent part:

(1)(a) If the defendant in any action or special proceeding is a public officer or employe and is proceeded against in an official capacity or is proceeded against as an individual because of acts committed while carrying out duties as an officer or employe and the jury or the court finds that the defendant was acting within the scope of employment, the judgment as to damages and costs entered against the officer or employe in excess of any insurance applicable to the officer or employe shall be paid by the state or political subdivision of which the defendant is an officer or employe.

\* \* \* \* \* \*

On and after March 1, 1983, all persons employed as deputy sheriffs, as defined in s. 40.02(48)(b)3, are covered by this subsection.

Wis.Stat.Ann. § 895.46 (West Supp.1983).

■ The Dissent incorrectly assumes that the 1977 version of section 895.46 applies in the instant case because the unlawful actions of the deputies took place in 1977. In so doing, the Dissent ignores the plain language of section 895.46 which makes a defendant's state or political subdivision financially liable only after, among other things, "the jury or the court finds that the defendant was acting within the scope of employment, ...." In the instant case, Sawyer County had only potential liability until September 1983 when the jury found that the deputies were acting within the scope of their employment. Nothing in the statute indicates that the Wisconsin legislature intended that section 895.46 apply only to officials' unlawful acts occurring after March 1, 1983. On the contrary, the clear language of the statute indicates that the legislature intended that the statute apply once an official's actions were found to be within the scope of employment by a jury or a court. Because the deputies were found to be acting within the scope of their employment in September 1983, the 1983 version of section 895.46 applies to the instant case.

While the jury in the instant case found that the deputies had acted within the scope of their employment when they deprived Hibma of his constitutional rights, the district court granted Sawyer County's motion for judgment notwithstanding the verdict because it found that the deputies were not acting within the scope of their employment.as required by section 895.46. The district court reasoned that

> an employee's tortious act is not within the scope of his or her employment unless two criteria are satisfied: the act must have been part of or reasonably incidental ·to the duties he or she was hired, directed, or expected to perform *and* it must have been intended to benefit the employer.

*Hibma v. Odegaard,* 576 F.Supp. 1549, 1553 (W.D.Wis.1984). The district court concluded that the deputies acted at all times for their own purposes and, therefore, could not have intended to benefit their employer.

The Wisconsin Supreme Court has defined "scope of employment" in the following manner:

> " ' "Not every act which an agent or servant may do while he is in the place appointed for the service, or during the time in which he is engaged in the performance, can be deemed to be within the course of the employment, or within the scope of the authority. The test lies deeper than that; it inheres in the relation which the act done bears to the employment. The act cannot be deemed to be within the course of the employment unless, upon looking at it, it can fairly be said to be a natural, not disconnected and not extraordinary, part or incident of the service contemplated." ' " *Id.* [*Scott v. Min-Aqua Bats Water Ski Club,* 79 Wis.2d 316, 255 N.W.2d 536, 538 (1977)] quoting *Seidl v. Knop,* 174 Wis. 397, 400, 182 N.W. 980 (1921). The scope of employment has also been defined to include those acts which are "so closely connected with what the servant is employed to do, and so fairly and

reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." Prosser, *Law of Torts,* (4th ed.) pp. 460–61, sec. 70 (hornbook series).

… Conduct within the scope of employment is limited to those acts which by law are attributable to the master or employer.

*Cameron v. City of Milwaukee,* 102 Wis.2d 448, 307 N.W.2d 164, 168–69 (1981).

While the predecessor of section 895.46 provided for indemnification if a public employee acted in good faith, *see* Wis.Stat. § 270.58, the legislature amended the statute in 1973 and substituted the present scope of employment requirement for the good faith requirement. *See* 1973 Wis. Laws ch. 333 § 173p. In certain circumstances, the courts still require an employee to exercise good faith in carrying out his duties in order to receive the protection of the indemnification statute. Absent good faith, the employee's actions in these instances would not further the objectives of the employment. *See, e.g., Schroeder, Gedlen, Riester & Moerke v. Schoessow,* 108 Wis.2d 49, 321 N.W.2d 131 (1982) (the exercise of legislative discretion must be done in good faith to fall within the scope of an alderman's employment). In other circumstances, however, the courts recognize that scope of employment includes "those acts which are 'so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.' " *Cameron,* 307 N.W.2d at 168–69 (quoting Prosser, *Law of Torts,* § 70 at 460–61 (4th ed. 1980)). The employee's actions in these instances further the objectives of the employment even absent good faith or an intention to benefit the employer. *Id. Cf. Ibrahim v. Samore,* 118 Wis.2d 720, 348 N.W.2d 554 (1984) (section 895.46 makes no distinction as to judgments based on intentional or negligent conduct).

*Bell v. City of Milwaukee,* 536 F.Supp. 462 (E.D.Wis.1982), involved two policemen who planted evidence, filed false reports and gave fabricated testimony to conceal the true nature of a fatal shooting. The city contested its responsibility to indemnify one of the police officers, Grady, because he "knowingly lied to police officials during the investigation of the shooting and perjured himself during the inquest, ...." *Id.* at 477. The city argued that Grady's actions were outside the scope of employment under section 895.46 because Grady "was acting on his own behalf, not on behalf of his employer." *Id.*

In considering the city's contentions, the court stated:

The actions taken by Grady during the chase and shooting of Daniel Bell and during the subsequent investigation, had they been done in good faith, would unquestionably be among the duties of a police officer and thus within the scope of employment. The duties of a police officer are not limited to the prevention of crime and apprehension of criminals. Rather, they include participation in investigations, reporting to superiors, and giving testimony at hearings and in court.

*Id.* The court found that Grady's actions carried out the objectives of his employment under *Cameron:* "[w]hile Grady's actions were unquestionably designed to further his own objective of escaping punishment for his wrongdoing, they also were designed to further the objectives of his employment. He was performing his duties as a police officer but used quite improper methods of carrying out those duties." *Id.* at 478. The court required the City to indemnify Grady.

In reviewing the propriety of the granting of the judgment notwithstanding the verdict,

we must affirm the district court if, without accounting for the credibility of the witnesses, we find that the evidence and

its inferences, considered as a whole and viewed in a light most favorable to the nonmoving party, can support only one reasonable conclusion—that the moving party is entitled to judgment notwithstanding the adverse verdict. Neither the district court nor this court is free to weigh the evidence or reach a result that it finds more reasonable as long as the jury's verdict is supported by substantial evidence.

*Airweld, Inc. v. Airco, Inc.,* 742 F.2d 1184, 1188 (9th Cir.1984) (citations omitted); *see also Selle v. Gibb,* 741 F.2d 896, 900 (7th Cir.1984). The evidence here before us reveals that Odegaard, Nikodem and Szula participated in investigations, reported to superiors, and gave testimony at hearings and in court regarding Hibma. While the deputies' actions were unquestionably designed to further their own objectives of escaping punishment for their own wrongdoing, they also were designed to further the objectives of Sawyer County. They were performing their duties as deputy sheriffs but using quite improper methods of carrying out those duties. The jury found that the deputies undertook some of their actions while in the scope of their employment and attributed $86,500 of the $166,500 award to those actions.

The district court granted Sawyer County's motion for judgment notwithstanding the verdict because it determined that section 895.46 requires that the deputies act with the intent to benefit Sawyer County. However, *Cameron* and *Bell* recognize that section 895.46 may require indemnification for actions which are not intended to benefit the employer when those actions further the objectives of the employment. Because the instant case falls squarely within the holding of *Bell* and because the jury's verdict was supported by substantial evidence, this Court finds that the district court erred when it granted Sawyer County's motion for judgment notwithstanding the verdict.[1]

---

1. The Dissent asserts that we and the jury have confused and commingled the "under color of state law" element of section 1983 with the

"scope of employment" element of section 895.-46. If this were true, the jury would have awarded the full $166,500.00 to Hibma rather

**Issue II. Whether the trial court erred in denying Hibma's post-trial motions to increase damages or alternatively for a new trial on the issue of damages?**

The trial court denied Hibma's motions to increase damages or for a new trial on the issue of damages because it found that "the total amount of damages awarded by the jury was neither clearly excessive nor clearly deficient; [the trial court] therefore declines to order a new trial on damages or add to the total award." *Hibma,* 576 F.Supp. at 1555.

**A. Motion to increase damages.**

█ Because Hibma based his claims on federal law, federal substantive law with respect to additur applies to his case. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under federal law, a court generally may not increase a jury's determination of damages by additur. Therefore, the trial court did not err in denying Hibma's motion to increase damages. *See Dimick v. Schiedt,* 293 U.S. 474, 486–87, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935); *see also United States v. 93.970 Acres of Land, More or Less, Situated in Cook County, Illinois,* 258 F.2d 17, 30–31 (7th Cir.1958), *rev'd on other grounds,* 360 U.S. 328, 79 S.Ct. 1193, 3 L.Ed.2d 1275 (1959); *Brewer v. Uniroyal, Inc.,* 498 F.2d 973, 976 (6th Cir.1974); *see generally* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2816 (1973); 6A J. Moore, J. Lucas & G. Grotheer, Jr., *Moore's Federal Practice* ¶ 59.08[8] (2d ed. 1984).

**B. Motion for a new trial on the issue of damages.**

█ In considering whether the trial court erred in denying Hibma a new trial on the issue of damages, this Court notes that

"a motion for a new trial is addressed to the sound discretion of the trial judge," *Durant v. Surety Homes Corp.,* 582 F.2d 1081, 1088 (7th Cir.1978), the standard of review is abuse of that discretion. "The only question before us is whether the district court abused its discretion in concluding that the jury did not abuse its discretion." *Galard v. Johnson,* 504 F.2d 1198 at 1202 (7th Cir. Ind.1974). As our court pointed out in *Continental Air Lines, Inc. v. Wagner-Morehouse, Inc.,* 401 F.2d 23 (7th Cir. 1968):

> "If the evidence in the record, viewed from the standpoint of the successful party, is sufficient to support the jury verdict, a new trial is not warranted merely because the jury could have reached a different result. [Citing cases.] Neither the trial court nor this Court may substitute its judgment for that of the jury on disputed issues of fact."

*Id.* at 30 (quoting *Gebhardt v. Wilson Freight Forwarding Co.,* 348 F.2d 129, 133 (3rd Cir.1965)).

*Robison v. Lescrenier,* 721 F.2d 1101, 1104 (7th Cir.1983). Having reviewed the record in the instant case, this Court finds that the evidence is sufficient to support the jury's verdict and award of $166,500 as damages. Because the jury could have awarded more (or less) does not require that a new trial be granted.

Hibma also seeks a new trial based on the exclusion of evidence of the sexual assault at the Green Bay Reformatory and based on the special verdict questions submitted to the jury.

**1. Exclusion of evidence.**

After the jury had determined that the deputies had violated Hibma's constitutional rights while acting in the scope of their employment, and before the damage phase

---

than reduce that amount by $80,000.00 to account for acts done outside the scope of the deputies' employment. By focusing on the most egregious acts of the deputies, the Dissent fails to notice that the deputies' participation in investigations, reporting to superiors, filing and

paperwork, testifying at trial, etc. furthered the objectives of Sawyer County. Because those activities support the jury's verdict, the district court ought not to have granted a judgment notwithstanding that verdict.

of the trial, the trial court granted Sawyer County's motion in limine and excluded evidence of a sexual assault upon Hibma by prisoners at the Green Bay Reformatory. The trial court excluded the evidence because it found the evidence to be irrelevant and unduly prejudicial and because it did not believe that Sawyer County had opened the door to questioning on the subject.

■ The general principles of tort liability govern the liability imposed under 42 U.S.C. § 1983, *Joseph v. Rowlen*, 425 F.2d 1010, 1013 (7th Cir.1970); *see also Carey v. Piphus*, 435 U.S. 247, 257–58, 98 S.Ct. 1042, 1049, 55 L.Ed.2d 252 (1978), and they provide guidance in the instant case.

Causation constitutes a necessary element in all tort cases. To establish tort liability, the victim must show that the wrongful act of the tort-feasor caused his injury. *See Schlanger v. Four-Phase Systems Inc.*, 555 F.Supp. 535, 538 (S.D.N.Y. 1982); Restatement (Second) of Torts § 430 (1965). To be a legal cause of harm to another, a tort-feasor's conduct must constitute a substantial factor in bringing about the harm. Restatement (Second) of Torts § 431. "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, . . . ." *Id.* comment a.

"The recovery of damages in actions for false imprisonment includes recovery for physical and mental injury, . . . as well as for physical discomfort in jail. . . . So long as a jury finds that the injury was the natural consequence of the false imprisonment and proximately related to it . . . " the tort-feasor's conduct constitutes a legal cause of the injury and the victim may recover. *Whirl v. Kern*, 407 F.2d 781, 797 (5th Cir.1969) (citations omitted). "[T]he tort feasor (sic) in a false imprisonment action may be liable for damages which are not anticipated, apprehended or foreseen, so long as they are natural and probable or direct consequences of the intentional

tort." *Johnson v. Greer*, 477 F.2d 101, 105 (5th Cir.1973). If the deputies' entrapment and resulting arrest and imprisonment of Hibma naturally or proximately caused his rape at the Green Bay Reformatory, their actions formed a legal cause of the rape and the trial court erred in excluding the evidence regarding it.

■ In assessing the propriety of the exclusion, this Court notes that "a willful or intentional tort feasor (sic) does not become an insurer of the safety of those whom he has wronged." *Id.* at 106. While the intentional tort-feasor must exercise utmost caution to prevent his victim from sustaining further harm, "even he remains insulated from injuries caused by wholly unforeseen accidents occurring without his agency." *Id.* at 107. Stated another way,

[a] person who commits a tort against another for the purpose of causing a particular harm to the other is liable for such harm if it results, whether or not it is expectable, except where the harm results from an outside force the risk of which is not increased by the defendant's act.

Restatement (Second) of Torts § 435A (1965). "[E]ven where the harm would not have occurred but for the tortious act, there is no liability if, although the resulting harm was of the same general nature as that intended, the defendant's act did not increase the risk of harm through the means by which it occurred." *Id.* comment a. Though this section of the Restatement (Second) considers the casual relationship between intentional torts and intended injuries, the principle logically applies where an unintended injury results from an intentional tort, *Johnson*, 477 F.2d at 107 (quoting Restatement of Torts § 870 and comment g).

■ The intentional torts or criminal acts of a third person may constitute a superseding cause of harm and may relieve a tort-feasor from liability for the harm caused by the third person's torts or acts. This principle applies when the original tort-feasor's negligence creates an opportunity for the third person to commit an

intentional tort or criminal act, *Gillot v. Washington Metropolitan Area Transit Authority*, 507 F.Supp. 454, 457 (D.D.C. 1981), as well as when the original tort-feasor's intentional action creates the opportunity, *see* W. Keeton, *Prosser and Keeton on Torts*, § 44 at 317–18 (5th ed. 1984); *see generally* Restatement (Second) of Torts § 448 and comment a (1965).

Further,

[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor

(a) knows or has reason to know that he has the ability to control the conduct of the third persons, and

(b) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 320 (1965). When the duty to prevent harm to a tort-feasor's victim shifts from the tort-feasor to a third party, the third party's failure to prevent harm to the victim may become a superseding cause and relieve the tort-feasor from liability. Restatement (Second) of Torts § 452 (1965). Comment f of Section 452 sets forth the factors that a court must consider in determining whether the duty has shifted:

the degree of danger and the magnitude of the risk of harm, the character and position of the third person who is to take the responsibility, his knowledge of the danger and the likelihood that he will or will not exercise proper care, his relation to the plaintiff or to the defendant, the lapse of time, and perhaps other considerations.

*Id.* comment f. Though Section 452 discusses shifting the duty of a negligent tort-feasor, the underlying principles and listed factors may give guidance to courts contemplating the liability of intentional tort-feasors.

■■■ The court has the exclusive function to declare the existence or non-existence of rules, such as those pertaining to superseding causes, which restrict the responsibility of a tort-feasor short of making him liable for harm of which his actions are a legal cause. *Id.* § 453. If the facts are undisputed, the court has the duty to apply to them the rules determining the existence or extent of the tort-feasor's liability. However, if reasonable men could differ as to whether the torts or criminal acts of a third person were intentional or foreseeable, the court should leave the application of the rules to the jury. *Id.* comment b.

■■■ In the instant case, Sawyer County transferred custody of Hibma from the deputies to the Wisconsin Prison System. During Hibma's incarceration at the Green Bay Reformatory, the duty to protect Hibma shifted from the deputies to the Wisconsin Prison System. Restatement (Second) of Torts §§ 320, 452 (1965). While Hibma was under the protection of the Wisconsin Prison System, other inmates sexually assaulted him. Though the deputies' actions set in motion the events which led to Hibma's confinement at the Green Bay Reformatory, the duty of protection assumed by the Wisconsin Prison System and the criminal acts of the other inmates formed superseding causes which prevent the deputies' actions from being a legal cause in bringing about the sexual assault. *See* W. Keeton, *supra;* Restatement (Second) of Torts §§ 440, 441, 448, 452. Because these facts were undisputed and because reasonable men could not differ as to whether the sexual assault was an intentional act and as to whether the duty to protect Hibma had shifted to the Wisconsin Prison System, the trial court properly determined whether the evidence of the sexual assault should be considered by the jury. Finally, the trial court correctly held that the sexual assault evidence was irrelevant for the purpose of assessing Hibma's dam-

ages because, as set forth above, the deputies' actions were not a legal cause of the assault upon Hibma.

## 2. Special verdict questions.

 Finally, Hibma ought not be granted a new trial on the basis that the trial court submitted an improper special verdict form to the jury. Under Federal Rule of Civil Procedure 49(a), "[t]he district court has considerable discretion as to the nature and scope of the issues to be submitted to the jury in the form of special verdict questions." *Sadowski v. Bombardier Limited,* 539 F.2d 615, 622 (7th Cir.1976) (citation omitted); *see also Worsham v. A.H. Robins Company,* 734 F.2d 676, 690 (11th Cir. 1984); *Central Progressive Bank v. Fireman's Fund Insurance Company,* 658 F.2d 377, 381 (5th Cir.1981). A reviewing court must limit its inquiry to whether the trial court abused its discretion. *Central Progressive Bank,* 658 F.2d at 381. Special verdict questions "must pose the question presented by the case accurately and be stated in a fashion that 'avoids the potential for confusing or misleading the jury.'" *Worsham,* 734 F.2d at 690 (quoting *Petes v. Hayes,* 664 F.2d 523, 525 (5th Cir.1981)); *see also Central Progressive Bank,* 658 F.2d at 381.

 After the liability portion of the instant case, the trial court, by means of special verdict questions, asked the jury whether any of the deputies had acted within the scope of their employment while depriving Hibma of his constitutional rights. After the damage portion of the trial, the trial court submitted special verdict questions which asked the jury to determine the amount of damages which the deputies proximately caused while acting *within* the scope of their employment and to determine the amount of damages proximately caused by the deputies while acting *outside* the scope of their employment. These questions accurately posed the question presented in the instant case and avoided the potential for confusing or misleading the jury. In effect, the trial court asked the jury to apply what it had found

in the liability portion of the trial to the evidence which the jury heard in the damage portion. Therefore, the trial court did not abuse its discretion in submitting these special verdict questions.

**Issue III. Whether 42 U.S.C. § 1988 entitles Hibma to an award of all his attorney's fees and costs?**

 42 U.S.C. § 1988 gives courts broad authority to award reasonable attorney's fees to "prevailing parties" in federal civil rights actions. *Smith v. Robinson,* —— U.S. ——, 104 S.Ct. 3457, 3466, 82 L.Ed.2d 746 (1984); *Illinois Welfare Rights Organization v. Miller,* 723 F.2d 564, 566 (7th Cir.1983). Section 1988 entrusts the determination of a fee award to the sound discretion of the district court because of "the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983); *In re Illinois Congressional Districts Reapportionment Cases,* 704 F.2d 380, 382 (7th Cir.1983). However, the district court has only a narrow discretion and should deny fees only where an award would be unjust. *Lenard v. Argento,* 699 F.2d 874, 899 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983). A reviewing court may set aside a trial court's fee determination only for an abuse of discretion. *In re Illinois Congressional District Reapportionment Cases,* 704 F.2d at 382; *Freeman v. Franzen,* 695 F.2d 485, 494 (7th Cir.1982), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983). The amount of the fee awarded turns on the facts of each case. *Hensley,* 103 S.Ct. at 1937.

 In the instant case, Hibma initiated this section 1983 action against Nikodem, Szula and Odegaard. Sawyer County intervened in October 1982 because it was potentially liable to Hibma by way of indemnification under Wis.Stat.Ann. § 895.46 (West Supp.1983). In August 1983, Nikodem and Szula stipulated to judgment be-

ing entered against them in an amount to be determined by the court. In determining the amount of attorney's fees to be awarded to Hibma, the trial court reviewed the time records submitted by Hibma's counsel and allowed all fees that it determined to be attributable to Hibma's section 1983 action and disallowed all fees that it determined to be attributable to Hibma's action against Sawyer County under Wis. Stat. § 895.46. In doing so, the trial court did not abuse the discretion afforded it under 42 U.S.C. § 1988.

■ Section 1988 applies to federal civil rights claims. *See* 42 U.S.C. § 1988. The fact that a plaintiff makes a constitutional claim "does not render automatic an award of fees for the entire proceeding." *Smith,* 104 S.Ct. at 3467. "Due regard must be paid, not only to the fact that a plaintiff 'prevailed,' but also to the relationship between the claims on which effort was expended and the ultimate relief obtained." *Id.* at 3466 (citing *Hensley,* 103 S.Ct. 1933); *see also Illinois Welfare Rights Organization v. Miller,* 723 F.2d 564, 567 (7th Cir. 1983). The ultimate relief obtained by Hibma in the instant action consisted of damages against the deputies under 42 U.S.C. § 1983. Wis.Stat. § 895.46 merely provided a means for Hibma to collect part of the award from Sawyer County. The Wisconsin statute neither enhanced nor diminished the award obtained under section 1983. Therefore, the trial judge properly disallowed all fees that it determined to be attributable to Hibma's pursuit of indemnification.

### Conclusion

For the reasons stated above, this Court REVERSES the order of the district court granting Sawyer County's motion for judgment notwithstanding the verdict, REVERSES the order of the district court vacating its previous order entering judgment against Sawyer County, and AFFIRMS the order of the district court in all other respects including the district court's determination of attorney's fees.

CUDAHY, Circuit Judge, concurring in part and dissenting in part.

I agree with the cogent analysis of the majority in holding that the actions of the deputy sheriffs were within the scope of their employment and concur in Section I of the panel opinion. I see no way to distinguish the acts of the deputy sheriffs here from those of the police officers involved in *Bell v. City of Milwaukee,* 536 F.Supp. 462 (E.D.Wis.1982), *aff'd in part, rev'd in part,* 746 F.2d 1205 (7th Cir.1984), and *Cameron v. City of Milwaukee,* 102 Wis.2d 448, 307 N.W.2d 164 (1981). In those cases, as here, the officers were acting for their own purposes but were doing, albeit very improperly, the type of thing which law enforcement personnel do. In *Bell* this court held that the city was required under section 895.46 to indemnify the officer for damages arising from the shooting and cover-up. 746 F.2d at 1271–72. In *Cameron* the Wisconsin Supreme Court held that the city was not entitled to summary judgment on the question whether the actions of the policemen were outside the scope of their employment because a finder of fact could reasonably conclude that the officers were acting within the scope of their employment. 102 Wis.2d at 459–60, 307 N.W.2d 164. It is also important to note that the Supreme Court of Wisconsin has recently affirmed a jury verdict that certain acts of an employee were within the scope of his employment where the acts were similar to those for which he had been hired and were made possible only by virtue of his role as employee, even though there was evidence the acts were done solely for the private purpose of the employee. *State v. Beaudry,* 123 Wis.2d 40, 365 N.W.2d 593 (1985). In addition, I do not believe it makes any difference whether the 1977 or 1983 version of the indemnity statute applies. The scope of employment language is the same in each, and the County is too deeply involved in the defense of this case to try at this point to wash its hands of the deputies' actions that are within the scope of employment.

However, I must dissent from parts of Sections II and III. I believe that the evidence of the sexual assault on Hibma while he was imprisoned in the Green Bay Reformatory should have been admitted. It was a matter for a properly instructed jury whether the defendant's acts in "framing" Hibma were the proximate cause of the prison rapes. Presumably, the factors noted in Comment f of Section 452 of the Restatement (quoted by the majority *ante* at 1156) would form the basis of such an instruction.

I do not disagree with the majority that Hibma's custody was transferred from the deputies to the Wisconsin prison system, which then had the primary responsibility for Hibma's protection, and that the sexual assault in question was an intentional act. But it does not follow from these facts that sexual assault is a consequence of false imprisonment which can be kept from the jury on a superseding cause theory. The majority reasons that because an intentional act against which a third party has a duty to protect the original tort-feasor's victim *might* be a superseding cause, the one before us *is* a superseding cause, and is such *as a matter of law*. This reasoning is quite fallacious. Indeed, on the majority's theory, a policeman who beat an individual could never be liable for any injuries resulting from the malpractice of the physician to whom the victim had resorted for treatment of the injuries sustained in the beating. Of course, the duty to protect would have shifted from the policeman to the physician. Yet under both general tort concepts and § 1983 such a policeman could be liable for the injuries.

"Violence is unfortunately endemic to American prisons." *Murphy v. United States,* 653 F.2d 637, 642 (D.C.Cir.1981); *see also Martin v. White,* 742 F.2d 469, 472–73 (8th Cir.1984). Gang rapes and homosexual assaults are common-place and frequent. As Justice Blackmun has written,

> [a] youthful inmate can expect to be subjected to homosexual gang rape his first night in jail, or, it has been said, even in the van on the way to jail. Weaker inmates become the property of the stronger prisoners or gangs, who sell the sexual services of the victim. Prison officials either are disinterested in stopping abuse of prisoners by other prisoners or are incapable of doing so, given the limited resources society allocates to the prison system. Prison officials often are merely indifferent to serious health and safety needs of prisoners as well.
>
> Even more appalling is the fact that guards frequently participate in the brutalization of inmates. The classic example is the beating or other punishment in retaliation for prisoner complaints or court actions.

*United States v. Bailey,* 444 U.S. 394, 421–22, 100 S.Ct. 624, 640, 62 L.Ed.2d 575 (1980) (Blackmun, J., dissenting) (footnotes omitted). Further, the number of § 1983 actions filed by prisoners alleging the failure of prison authorities to protect them from rape and assault is legion.

I believe, therefore, that it is a jury question whether homosexual rape is not such a routine and foreseeable part of this, and indeed of any, kind of prison experience—regardless of the vigilance of the prison guards—that the chain of causation was broken by a superseding cause. The authorities cited by the majority show, I believe, that it is a question of fact for the jury whether the deputies' actions in this case were the proximate cause of the injuries suffered in prison by the plaintiff.

In § 1983 actions based on false imprisonment, the injury must be proximately related to the wrong. *Johnson v. Greer,* 477 F.2d 101, 105 (5th Cir.1973); *Whirl v. Kern,* 407 F.2d 781, 797 (5th Cir.1968), *cert. denied,* 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969). The statute does not add a qualification that only a defendant who is the immediate, direct and precipitating cause of the plaintiff's injuries is liable to him. *Redmond v. Baxley,* 475 F.Supp. 1111, 1116 (E.D.Mich.1979). In defining proximate cause, the reasoning of the Fifth Circuit in *Johnson v. Greer,* on which the majority relies, is instructive.

Neither of these [prior] cases, however, focused on the proper rule to be applied in determining whether the jury was proximately related to the wrong or a foreseeable consequence thereof. Thus, we look for guidance to "the prevailing view [of tort law] in this country" in determining the proper federal rule to apply to this case.

. . . .

We focus our opinion not on the metaphysical "but for" sequence of events preceding Johnson's injury but rather on the question of whether the principles of logic, fairness, and justice dictate the defendant should be held liable in a given situation. The cases are in accord that even a willful or intentional tort feasor does not become an insurer of the safety of those whom he has wronged. For example, if the [prison] had been destroyed by an earthquake, no one could rationally contend Greer should be liable for injuries befalling Johnson. On the other hand, the courts have generally held that where the acts of a defendant constitute an intentional tort or reckless misconduct, as distinguished from mere negligence, the aggravated nature of his action is a matter which should be taken into account in determining whether there is a sufficient relationship between the wrong and plaintiff's harm to render the actor liable. Specifically, the factors to be taken into account are the tort feasor's intention to commit a wrongful act, the degree of his moral wrong in so acting, and the seriousness of the harm intended. The touchstone for deciding the scope of the defendant's liability in a false imprisonment action properly brought under a federal statute is the intent and object of the officer in detaining the plaintiff. While, as we have iterated, mere good intentions do not in themselves create a defense to the action, justice, fairness, and sound policy coalesce to indicate that an officer acting under color of law without malice or bad intent should be liable only for those injuries which an ordinarily prudent man would reasonably foresee would result from his actions. On the other hand, officers acting with malice or bad intent ought additionally to be held responsible for those injuries which have a more attenuated causal relationship to their willful misconduct. Thus, in a false imprisonment action brought under Section 1983, the tort feasor acting under color of law with malice or bad intent *must be held responsible for all injuries which could have been prevented by the exercise of the utmost caution characteristic of very careful men,* though even he remains insulated from injuries caused by wholly unforeseen accidents occurring without his agency. Nor is he responsible for injuries against which no human care or foresight could guard and which are not caused in any degree by his gross neglect or intentional conduct.

. . . .

The correct rule of law to be applied to this cause is indicated by analogy in the Restatement of Torts, Section 870.

A person who does any tortious act for the purpose of causing harm to another or to his things or to the pecuniary interest of another, is liable to the other for such harm if it results, *except where the harm results from an outside force the risk of which is not increased by the defendant's act.* [Emphasis added.]

Comment "g" to that section amplifies this rule.

Even where the defendant's act is in fact a cause of harm, in the sense that the harm would not otherwise have occurred, he is not liable to a person whom he intended to harm and who has been harmed, unless from the standpoint of a reasonable man, his act in some degree increased the risk of that harm.

Though this section of the Restatement deals expressly with the necessary causal relationship between an intentional wrong and a resulting *intended injury,* a fortiori the principle applies where, as here, an unintended injury results from an intentional tort.

*Johnson v. Greer*, 477 F.2d at 106–07 (first emphasis added) (citations omitted).

No one contends that the deputies intended that Hibma be raped in prison, but their actions did obviously and substantially increase the risk of that harm. Therefore, it is a question of fact for the jury whether sexual assault is not a natural and probable consequence of being sent to prison for an extended period. *See Wade v. Haynes*, 663 F.2d 778 (8th Cir.1981), *aff'd on other grounds*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *Johnson v. Greer, supra*. It is not, in my view, a consequence which can be excluded as a matter of law on a superseding cause theory. One who wrongfully sends another to prison may justly bear damages resulting from the uglier features of prison life.

I also disagree with the majority on the award of attorney's fees. The plaintiff in a § 1983 action has a right to a jury trial. It was therefore an abuse of discretion for the district court to reduce the award because it would have taken only one day to justify an award of damages in a bench trial. Further, Sawyer County did not limit its defense to the issue of scope of employment, but contested the amount of damages for which the individual defendants would be liable whether or not the county was required to indemnify them. This defense benefited both the individual defendants and the county. For this reason, it was also an abuse of discretion to reduce the fee award on the ground that much of the plaintiff's work would have been unnecessary but for the intervention of the county. The individual defendants accepted the benefit of the county's intervention on their behalf. They should not be allowed to further profit on the theory that the plaintiff would have had an easier time if the county had not intervened. The proper issue is not who is presenting the defense, but on which claim the plaintiff is being forced to expend additional effort through action of the intervening defendant.

I therefore respectfully dissent as to the matters indicated.

COFFEY, Circuit Judge, concurring in part and dissenting in part.

I concur in Section II of the opinion that the district court judge did not abuse his discretion in denying the plaintiff's motion to increase the damage award or in denying the plaintiff's motion for a new trial. I, likewise, concur in Section III of the opinion that the district court judge did not abuse his discretion in awarding the plaintiff $32,643 in attorney's fees. I dissent, however, from the majority's conclusion in Section I of the opinion that the district court judge erred in entering judgment notwithstanding the verdict in favor of the intervening defendant, Sawyer County, Wisconsin. The record clearly reveals that the defendants, Richard Odegaard, James Nikodem, and Michael Szula, were not acting within the scope of their employment, as sheriff deputies of Sawyer County, when they deprived the plaintiff of his constitutional rights. Thus, pursuant to Wis. Stat. § 895.46 (1977–78), Sawyer County is not liable for any damages assessed against the defendants.

I

The record reveals that in 1977, the defendants, Richard Odegaard, James Nikodem, and Michael Szula, were employed by Sawyer County, Wisconsin, as full-time deputy sheriffs. In early April 1977, the defendant deputy sheriffs burglarized several summer cottages in the Spider Lake area of Sawyer County, stealing, *inter alia*, firearms and animal skins. Soon thereafter, the defendant deputy sheriffs became concerned that the Sawyer County sheriff would discover their criminal activities and thus they devised a scheme to frame the plaintiff, George Hibma, with the burglaries that they had, in fact, committed. The defendants chose Hibma as the target of their cover-up conspiracy because he had recently been convicted of a similar burglary involving the theft of animal skins, and was still serving probation for that crime. In addition, Hibma had previously been convicted in Federal court for conspiracy to manufacture a controlled

substance and was, as of April 1977, chemically dependent upon various stimulant drugs, including cocaine, Methadrine, and Ritalin, a medication prescribed for his narcolepsy.

In furtherance of the cover-up conspiracy, the defendants contacted William Proffitt, an acquaintance of Hibma's who was serving a sentence in the Sawyer County jail on a daytime work release program. The defendants initially asked Proffitt to purchase a quantity of drugs from Hibma, assuring Proffitt that if he cooperated in the scheme his sentence would be reduced. Proffitt refused to solicit the drugs but did agree to approach Hibma and ask if he would steal some firearms for later sale through a fence operation in Minnesota. On at least seven separate occasions in early April, Proffitt contacted Hibma and urged him to steal firearms. Finally, on April 19, 1977, Hibma stole a handgun and delivered it to Proffitt who turned the handgun over to the defendants. Two days later, at approximately 8:30 a.m. on the morning of April 21, 1977, Hibma met with Proffitt to receive his cash payment and at that time the defendants apprehended Hibma, placed him under arrest, read him his *Miranda* rights, handcuffed him, and transported him to the Sawyer County jail.

Upon arrival at the jail, Hibma informed the defendants that he was suffering drug withdrawal symptoms and needed medical attention. Defendant Odegaard responded, "Gee, that is too bad," and persisted in interrogating Hibma concerning the theft of the handgun and his knowledge of the Spider Lake burglaries that the deputy sheriffs had, in fact, committed. Hibma admitted to stealing the handgun but denied any knowledge of, or participation in, the Spider Lake burglaries. Defendant Odegaard suggested that if Hibma was truly innocent of the previous burglaries, he should sign a consent form authorizing the defendants to search his house without a warrant. Hibma responded that he "had nothing to hide," and thus he signed the consent form. Unknown to Hibma, the defendants had secretly placed the animal skins and firearms that they had stolen in the Spider Lake burglaries around Hibma's premises.

Following Hibma's signing of the consent form, the defendants booked Hibma, took his photograph and fingerprints, placed him in a cold shower, dressed him in a jailhouse uniform, and locked him in a holding cell. The defendants then left the jail for a "couple of hours" to search Hibma's premises, at no time providing Hibma with medical treatment for his drug withdrawal symptoms. When the defendants returned to the jail, they hauled Hibma into Odegaard's office and questioned him concerning the animal skins and rifles they claimed to have discovered at his residence. Hibma continued to deny knowledge of the items or participation in any of the Spider Lake burglaries. On three or four separate occasions, the defendants informed Hibma that he was going to be charged with one count of theft and fourteen counts of burglary and, if found guilty, that he would serve approximately ninety-four years in prison. Throughout this questioning period, Hibma continued to suffer from drug withdrawal, experiencing chills, vomiting, and diarrhea, but during the entire period Hibma insisted that he had no knowledge of the Spider Lake burglaries. Unable to coerce a confession, the defendants transported Hibma back to his holding cell and continued to refuse his request for medical assistance.

While confined in the holding cell, Hibma felt as though "nothing was going to be done" for his illness, so he decided to draw attention to his condition by breaking his eyeglasses, placing a superficial cut on his wrist, and screaming that he was committing suicide. The defendants immediately called a doctor, who treated the superficial wrist wound and, realizing that Hibma was suffering drug withdrawal symptoms, made arrangements for Hibma to receive professional care for his chemical dependency problem. On April 22, 1977, at approximately 3:00 a.m. in the morning, some eighteen hours after Hibma had been arrested by the defendants, he was transport-

ed to the Dunn County Health Care Center in Menomonie, Wisconsin, where he underwent treatment for his chemical dependency. Later that same day, defendant deputy sheriff Nikodem knowingly filed a false sheriff's report stating that Hibma was responsible for the Spider Lake burglaries. Similarly, defendant deputy sheriff Szula knowingly signed a false criminal complaint, charging Hibma with the firearm theft and the Spider Lake burglaries. Some five days later, on April 27, 1977, defendant deputy sheriffs Odegaard and Nikodem knowingly prepared a false press release for the local Sawyer County newspaper, stating that Hibma's arrest "resulted in clearing numerous burglaries in [sic] Sawyer County has been plagued with since the beginning of the year." *See* Sawyer County Gazette, April 28, 1977.

On April 29, 1977, Hibma appeared in the Circuit Court of Sawyer County, waived his right to a preliminary hearing and, pursuant to a plea agreement, plead guilty to the handgun theft in return for a dismissal of the burglary charges. In response to a request of the circuit court judge that the State of Wisconsin introduce factual evidence to support the theft charge, defendant deputy sheriff Odegaard testified, *inter alia*, that, "[a]n informant informed us that Mr. Hibma wanted to sell a gun to him for a certain price and the gun was delivered by Mr. Hibma and money was transferred and Mr. Hibma was picked up on it." The court sentenced Hibma to "an indeterminate term not to exceed two years" for the theft charge and Hibma actually served a period of confinement of one year and one day in various county and state institutions.

In May 1980, the Federal Bureau of Investigation commenced an unrelated probe of the Sawyer County Sheriff's Department for alleged liquor law violations and, following a thorough year-and-a-half investigation, the Federal officials uncovered the defendants' unlawful scheme to frame Hibma for the Spider Lake Burglaries. In December 1981, the Government charged defendant Nikodem with two counts of making false declarations to a Federal Grand Jury in violation of 18 U.S.C. §§ 371, 1623, defendant Szula with one count of making false statements to the Federal Bureau of Investigation in violation of 18 U.S.C. § 1001, and defendant Odegaard with one count of depriving Hibma of his civil rights in violation of 18 U.S.C. § 241. All three defendants plead guilty to the crimes charged and, in view of the egregious nature of the offenses, the district court judge sentenced Nikodem to a three year prison term, Szula to a four year prison term, and Odegaard to a five year prison term.

In July 1982, Hibma filed a section 1983 lawsuit against the defendant deputy sheriffs, alleging a violation of his Fourth Amendment right to be free from unreasonable searches and seizures and his Fourteenth Amendment right to due process of law. Sawyer County sought and was granted leave to intervene as a party defendant because of its potential liability, under Wis.Stat. § 895.46, to pay the damages assessed against Sawyer County officers for "acts committed while carrying out duties as an officer or employee ... acting within the scope of employment." At the time of the defendants' unlawful actions in April 1977, deputy sheriffs employed on a civil service basis, such as the defendants, were included within the scope of Wis.Stat. § 895.46. The statute provided that the county's payment of any damages assessed against a deputy sheriff, employed on a civil service basis, who was carrying out his duties and acting within the scope of his employment, was "discretionary and not mandatory." The purpose of the discretionary determination, on the part of the county, as to whether or not to pay for the damages assessed against a deputy sheriff employed on a civil service basis, is to accommodate art. VI, sec. 4 of the Wisconsin Constitution which provides that "the county shall never be made responsible for the acts of the sheriff," with Wis.Stat. § 895.46, which is intended to include the greatest number of public officials possible. *See Bablitch and Bablitch v. Lincoln County*, 82 Wis.2d 574, 582–83, 263 N.W.2d

218, 223 (1978). Thus, under the 1977 version of section 895.46, Sawyer County's payment of any damages assessed against the defendant deputy sheriffs would be, at best, only discretionary and not mandatory as directed by the majority.

I note that in 1983, the Wisconsin legislature amended Wis.Stat. § 895.46 to provide:

> "(d) On and after March 1, 1983, all persons employed as deputy sheriffs, as defined in s. 40.02(48)(b) 3, are covered by this subsection. The county board shall adopt written policies for payments under this subsection on behalf of any other person, provided that person has satisfied the minimum standards of the law enforcement standards board, who serves at the discretion of the sheriff as a law enforcement officer as defined in s. 165.85(2)(c), and the county may make the payments upon approval by the county board."

Judge Grant incorrectly claims that "the 1983 version of section 895.46 applies to the instant case." The law in Wisconsin expressly provides that "[a]n amendatory statute, like other legislative acts, takes effect only from its passage, and will not be construed as retroactive *or as applying to prior facts or transactions,* or to pending proceedings, unless a contrary intention is expressly stated or necessarily implied." *Truesdale v. State,* 60 Wis.2d 481, 489, 210 N.W.2d 726, 730 (1973) (emphasis added) (quoting *Wisconsin Department of Revenue v. Dziubek,* 45 Wis.2d 499, 505, 173 N.W.2d 642, 645 (1970)). *See also State ex rel. Briggs & Stratton v. Noll,* 100 Wis.2d 650, 655, 302 N.W.2d 487, 490 (1981); *Dallman v. Dallman,* 159 Wis. 480, 486, 149 N.W. 137, 139 (1915). The only exception to this rule is when the statute "is procedural or remedial, rather than substantive, in which case the statute is generally given retroactive effect." *Hathaway v. Joint School Dist. No. 1,* 116 Wis.2d 388, 400 n. 4, 342 N.W.2d 682, 688 n. 4 (1984) (citing *Gutter v. Seamandel,* 103 Wis.2d 1, 17, 308 N.W.2d 403, 411 (1981)). *See also Boggs v. Morden,* 117 Wis.2d 773, 775, 345 N.W.2d 490, 491

(1984). In the present case, Wis.Stat. § 895.46 is clearly a substantive, rather than a procedural or remedial statute, as it provides for the payment of judgments rendered against an officer of the State or other political subdivision. Moreover, the Wisconsin legislature, in amending section 895.46, did not expressly state nor much less imply that the amended statute was to apply retroactively. Accordingly, this court is compelled under the controlling Wisconsin state law to apply the 1977 version of Wis.Stat. § 895.46 to the facts in this case, which arose in April 1977. *See, e.g., Hibma v. Odegaard,* 576 F.Supp. 1549, 1550 (1984) (applying the 1977 version of Wis.Stat. § 895.46 to the facts in this case). Judge Cudahy asserts that it makes no difference whether the 1977 or 1983 version of Wis.Stat. § 895.46 applies in this case because Sawyer County "is too deeply involved in the defense of this case to try at this point to wash its hands of the deputies' actions. . . ." I disagree with Judge Cudahy's theory that because Sawyer County properly intervened in this action to defend against potential liability and to protect the financial interests of its taxpayers, it is now precluded from exercising discretion in indemnifying the deputy sheriffs for their damages. A thorough analysis of Wisconsin case law reveals that the 1977 version of Wis.Stat. § 895.46 applies in this case and allows Sawyer County to exercise discretion in the payment of damages assessed against deputy sheriffs found to be acting within the scope of their employment.

Prior to the trial on Hibma's section 1983 claim, the parties agreed that the defendants had unlawfully entrapped Hibma into stealing the handgun and thus Hibma was wrongfully convicted and sentenced to prison. The parties stipulated that:

> "the activities of the three deputy sheriff defendants, Richard T. Odegaard, James Nikodem and Michael Paul Szula, did indeed amount to entrapment. An entrapment is a defense which can be offered by a defendant and if it is successful will not allow a conviction. The Court be-

lieves based upon the stipulation of the parties entrapment did occur and had that been brought to the attention of the authorities of Sawyer County, there would not have been a conviction of the offense for which Mr. Hibma pleaded guilty and was convicted on June 29, 1979; he would not have served a year and a day in the state prisons."

The defendants further admitted that they arrested Hibma and charged him with the Spider Lake burglaries in an attempt to conceal the crimes that they had, in fact, committed. Thus, the parties further stipulated that:

"The reasons or motivations for such acts committed by Defendants, Richard T. Odegaard, James Nikodem, and Michael Szula, against George Hibma were for the purpose of (a) removing themselves as possible suspects for the criminal acts of burglary and theft which Defendants Richard T. Odegaard, James Nikodem, and Michael Szula, had themselves committed...."

Based upon the evidence presented at trial, the jury found that the defendants had deprived Hibma of his constitutional rights in violation of 42 U.S.C. § 1983. The jury awarded Hibma $166,500 in damages, allocating $86,500 to acts committed by the defendants within the scope of their employment and $80,000 to acts committed outside the scope of their employment.

Sawyer County filed a motion for judgment notwithstanding the verdict, arguing that the defendants were at no time acting within the scope of their employment. The district court judge reviewed the relevant Wisconsin case law and the evidence presented at trial to determine whether or not a reasonable trier of fact could have found that the defendants were acting within the scope of their employment when they deprived Hibma of his constitutional rights. The district court concluded that:

"there are no facts or inferences supporting a finding that defendants Odegaard, Nikodem and Szula were acting for anything other than their own purposes in entrapping plaintiff Hibma, engineering

his arrest, planting evidence in and stealing property from his home, denying him medical attention during drug withdrawal, seeking the issuance of a complaint charging him with scores of burglaries they knew he had not committed and finally securing his guilty plea and conviction through coercion and false testimony. The ex-deputies' plot to hide their own burglaries did not evolve *after* they had entrapped and arrested Hibma; rather, the plot was the cause and purpose of their actions from the very beginning of their illegal conduct."

*Hibma v. Odegaard,* 576 F.Supp. at 1554 (emphasis original). Accordingly, the district court judge granted Sawyer County's motion for judgment notwithstanding the verdict, ruling that because the defendants were not acting within the scope of their employment when they deprived Hibma of his constitutional rights, Sawyer County was not liable, under Wis.Stat. § 895.46, for any of the defendants' damages.

## II

To prevail in a civil rights action under 42 U.S.C. § 1983, the plaintiff must establish that the defendant was acting "under color of state law" when he deprived the plaintiff of his constitutional rights. This "under color of state law" element of a section 1983 action is satisfied even when the defendant misuses or abuses his power, so long as that power is conferred by state law and the defendant is clothed with the authority of state law. Indeed, the Supreme Court ruled in *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), that "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." 313 U.S. at 326, 61 S.Ct. at 1043 (citing *Ex parte Virginia,* 100 U.S. (10 Otto) 339, 346, 25 L.Ed. 676 (1880)). *See also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929, 102 S.Ct. 2744, 2748, 73 L.Ed.2d 482 (1982). In the present case, the defendants were at all times employed as full-time deputy sheriffs for Sawyer County, vested with the author-

ity to make lawful arrests, detain criminal suspects at the Sawyer County jail, and file criminal complaints. The record reveals that the defendants violated their oath of office and completely abused their authority, as they unlawfully entrapped Hibma into stealing a handgun, placed him under arrest, transported him to the Sawyer County jail in a sheriff's squad car, booked him, detained him in a holding cell, denied his request for medical attention, filed a false sheriff's complaint, signed a false criminal report, prepared a false press release, and secured Hibma's guilty plea and conviction based upon their conspiracy of entrapment. The record further reveals that the defendants' misuse of power was possible only because they were "clothed with the authority of state law" as deputy sheriffs. Thus, according to the Supreme Court's analysis in *United States v. Classic*, the defendants acted "under color of state law" when they deprived Hibma of his constitutional rights.

The majority confuses and commingles this "under color of state law" element of a section 1983 action with the completely separate and distinct issue of damage liability under Wisconsin state law. Wis.Stat. § 895.46 (1977–78) provides, in pertinent part, that:

"(1) Where the defendant in any action or special proceeding is a public officer or employe and is proceeded against in an official capacity or is proceeded against as an individual because of acts committed while carrying out duties as an officer or employe and the jury or the court finds that such defendant was acting *within the scope of employment* the judgment as to damages and costs entered against the officer or employe in excess of any insurance applicable to such officer or employe shall be paid by the state or

political subdivision of which the defendant is an officer or employe. .

\* \* \* \* \* \*

Deputy sheriffs in those counties where they serve not at the will of the sheriff but on civil service basis shall be covered by this subsection, except that the provision relating to payment of the judgment shall be discretionary and not mandatory. In such counties the judgment as to damages and costs may be paid by the county if approved by the county board."

(Emphasis added).[1] Pursuant to Wisconsin state law, Sawyer County may be liable for any damages assessed against the defendants for carrying out duties, as officers of Sawyer County, within the scope of their employment. The majority opinion suggests that once the officers are found to be acting "under color of state law" it is implicitly assumed that the officers are also acting within the scope of their employment for purposes of Wis.Stat. § 895.46. According to the majority:

"Odegaard, Nikodem and Szula participated in investigations, reported to superiors, and gave testimony at hearings and in court regarding Hibma. While the deputies' actions were unquestionably designed to further their own objectives of escaping punishment for their own wrongdoing, they also were designed to further the objectives of Sawyer County. They were performing their duties as deputy sheriffs but using quite improper methods of carrying out those duties."

I dissent from the majority's unreasoned conclusion that the defendants' actions were designed to further the objectives of Sawyer County when the sole purpose of the defendants' unlawful conduct was to

---

**1.** In April 1977, the defendants were deputy sheriffs employed by Sawyer County on a civil service basis and thus fall within the ambit of Wis.Stat. § 895.46. The 1977 version of the statute expressly provides that if damages are assessed against deputy sheriffs, such as the defendants, for acts committed within the scope of their employment, the county's payment of

those damages is discretionary, not mandatory. Thus, even under the majority's analysis that Sawyer County is liable for $86,500 in damages, according to Wis.Stat. § 895.46 as it existed at the time of the defendants' unlawful conduct, the county's payment of the defendants' damages is, at best, only discretionary and not mandatory. *See* discussion in section I.

transfer their criminal liability to an innocent Hibma and thus retain their positions as deputy sheriffs. The defendants admitted at trial that their actions were conceived and carried out for the exclusive, unlawful purpose of removing themselves as suspects in the Spider Lake burglaries. Moreover, I dissent from the majority's complete refusal to distinguish the "under color of state law" element of a section 1983 action from the defined and limiting phrase, "within the scope of employment," as used in Wis.Stat. § 895.46.

Sawyer County's potential damage liability arises solely under Wisconsin state law, not under Federal law, and thus I turn to Wisconsin case law in order to properly interpret the phrase "within the scope of employment," as used in Wis.Stat. § 895.-46.[2] In *Cameron v. City of Milwaukee*, 102 Wis.2d 448, 307 N.W.2d 164 (1981) ("*Cameron*"), the Wisconsin Supreme Court analyzed the "scope of employment" requirement of section 895.46 and ruled that:

"a finding with regard to action under 'color of law' is not identical to a finding that specific acts are done 'within the scope of employment' of a public official or employee.

\* \* \* \* \* \*

We do not perceive a substantial equation between conduct which is within the scope of a municipal or state employee's employment and conduct which may be termed 'under color of law.' *Conduct*

*within the scope of employment is limited to those acts which by law are attributable to the master or employer.* However, for purposes of sec. 1983, acts under color of law are not limited to conduct attributable to the state by virtue of the employer-employee relationship."

102 Wis.2d at 456–57, 307 N.W.2d at 168–69 (emphasis added). The Wisconsin District Court, in *Harris v. County of Racine*, 512 F.Supp. 1273 (E.D.Wis.1981), likewise, concluded that:

"[i]n interpreting the phrase 'acting within the scope of employment' as used in § 895.46(1), the relevant case law does suggest that the phrase is equivalent to acting 'while carrying out duties as an officer or employe' and does not encompass all actions taken by an employee while acting 'under color of state law.'"

512 F.Supp. at 1279. Moreover, the express language of the statute reveals that the Wisconsin legislature purposefully chose to include the narrow, limiting phrase "within the scope of employment" rather than the broad term "under color of state law," within Wis.Stat. § 895.46. According to the Wisconsin Supreme Court, the "scope of employment" test of Wis. Stat. § 895.46 is a narrow, defined test that does not include "any act growing out of or committed in the course of the discharge of the officer's, employe's or agent's duties...." *Ibrahim v. Samore*, 118 Wis.2d 720, 725–26, 348 N.W.2d 554, 557

---

**2.** Sawyer County's liability in this action arises solely under the Wisconsin state law of indemnification set forth in Wis.Stat. § 895.46, and not under the Federal civil rights statute of 42 U.S.C. § 1983. According to the Supreme Court in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), local governing bodies can be sued directly under section 1983 only when:

"the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers ... [or] the ... constitutional deprivations [are] visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."

436 U.S. at 690–91, 98 S.Ct. at 2036. Moreover, the Supreme Court recently explained in *Oklahoma City v. Tuttle*, — U.S. —, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." — U.S. at —, 105 S.Ct. at 2436. In the present case, Sawyer County maintains neither a policy nor a custom of allowing deputy sheriffs to commit burglaries and then frame innocent members of the public with responsibility for their crimes.

(1984). It is thus apparent from Wisconsin case law that the "scope of employment" requirement of Wis.Stat. § 895.46 is a far more narrow, limited, defined concept of law than the "under color of state law" element of a section 1983 action. Contrary to the majority's analysis, upon a finding that officers are acting under color of state law for purposes of a section 1983 action, it does not necessarily follow that the officers are also acting within the scope of their employment for purposes of Wis.Stat. § 895.46. Instead, the "scope of employment" requirement of section 895.46 is a narrow, limiting concept of law rooted in the doctrine of *respondeat superior* and including only those acts of an employee that are legally attributable to the employer.

The legislative history of Wis.Stat. § 895.46 reveals that "it was enacted originally to protect public officers from personal responsibility for judgments arising out of their official duties." *Horace Mann Ins. Co. v. Wauwatosa Bd. of Ed.*, 88 Wis.2d 385, 389, 276 N.W.2d 761, 764 (1979). *See also Schroeder, Gedlen, Riester, etc. v. Schoessow*, 108 Wis.2d 49, 68, 321 N.W.2d 131, 140 (1982). The statute, as originally enacted in 1943, "required the state or political subdivision to pay judgments as to damages and costs against public officers acting in an official capacity and *in good faith.*" *Horace Mann Ins. Co. v. Wauwatosa Bd. of Ed.*, 88 Wis.2d at 389, 276 N.W.2d at 764 (emphasis added). In 1973, the Wisconsin legislature amended the statute, substituting the phrase "within the scope of employment" for the phrase "in good faith." According to the Wisconsin Supreme Court, "[t]he concept of 'scope of employment' has its genesis in the doctrine of *respondeat superior*. The general rule is that a master is subject to liability for the torts of his servants committed while acting within the scope of their employment." *Cameron*, 102 Wis.2d at 456, 307 N.W.2d at 168. The Wisconsin Supreme Court explained that under the concept of "scope of employment," as used in Wis.Stat. § 895.46:

"'[n]ot every act which an agent or servant may do while he is in the place appointed for the service, or during the time in which he is engaged in the performance, can be deemed to be within the course of the employment, or within the scope of the authority. The test lies deeper than that; it inheres in the relation which the act done bears to the employment. *The act cannot be deemed to be within the course of the employment unless, upon looking at it, it can fairly be said to be a natural, not disconnected and not extraordinary, part or incident of the service contemplated.*'"

*Id.* (emphasis added) (quoting *Scott v. Min-Aqua Bats Water Ski Club*, 79 Wis.2d 316, 320, 255 N.W.2d 536, 538 (1977)). In addition, the Wisconsin Supreme Court continues to recognize that, despite substitution of the phrase "within the scope of employment" for the phrase "in good faith" in Wis.Stat. § 895.46, the good faith requirement is "implicit in the question of whether public officials acted within the scope of their employment." *Schroeder, Gedlen, Riester, etc. v. Schoessow*, 108 Wis.2d at 69, 321 N.W.2d at 141. Thus, Wisconsin case law reveals that the phrase "within the scope of employment," as used in Wis. Stat. § 895.46, is a narrow, limiting concept of law intended to hold employers liable only for those acts of the employee that are performed in good faith and are a natural part or incident of the service contemplated.

In the present case, it is beyond dispute that the defendants did not act in good faith when they deprived Hibma of his constitutional rights. The defendants committed a series of burglaries in the Spider Lake area and intentionally contrived a cover-up scheme to frame Hibma for the burglaries. In furtherance of this cover-up conspiracy, the defendants entrapped Hibma into stealing a handgun, wrongfully arrested Hibma, placed him in the Sawyer County jail, forced him into a cold shower that compounded the chills he was experiencing due to drug withdrawal, and refused his request for medical assistance, all

in an attempt to force Hibma to admit crimes that he did not commit. Furthermore, the defendants knowingly, intentionally, and maliciously lied about Hibma's involvement in the Spider Lake burglaries as they prepared a false sheriff's report stating that Hibma committed the burglaries, signed a false criminal complaint alleging that Hibma committed the burglaries, prepared a false press release claiming that Hibma's arrest solved the recent string of burglaries in Sawyer County, and secured Hibma's guilty plea and conviction in Sawyer County Circuit Court based upon their conspiracy of entrapment. Indeed, the defendants admitted at trial that their purpose in committing these illegal acts was to "remov[e] themselves as possible suspects for the criminal acts of burglary and theft" that they had, in fact, committed.

It is further evident that not one of the defendants' actions, as recited in the scandalous record of criminal violations, is legally attributable to the employer, Sawyer County, under the doctrine of *respondeat superior*. In Wisconsin, an employee's act is within the scope of employment only if "it can fairly be said to be a natural, not disconnected and not extraordinary, part or incident of the service contemplated." *Cameron*, 102 Wis.2d at 456, 307 N.W.2d at 168. According to the Wisconsin Supreme Court:

> "[t]he mere fact that the servant commits a tort during the period of his employment is not enough to put the act within the scope of his employment. *The test is whether the servant has stepped aside from the business of his principal to accomplish an independent purpose of his own*, or whether he was actuated by an intent to carry out his employment and to serve his master."

*Linden v. City Car Co.*, 239 Wis. 236, 239, 300 N.W. 925, 926 (1941) (emphasis added) (citations omitted). The Wisconsin Supreme Court adds that, " '[i]f the agent or servant ... steps outside of his employment to do some act for himself, not connected with his principal's business, the latter will not be liable for the agent's

negligence while so engaged.' " *Firemen's Fund Ins. Co. v. Schreiber,* 150 Wis. 42, 50, 135 N.W. 507, 510 (1912) (quoting Mechem, Agency § 737). Furthermore, in Wisconsin:

> "to make the master responsible for the negligence of a servant under the doctrine of *respondeat superior,* it is not sufficient that the act was done during period of employment. The act must be one done in the prosecution of the principal's business, not while stepping aside therefrom to serve a personal or some other end. The element of stepping aside which is essential to break the nexus between the master and the servant may be momentary and needs only a change of mental attitude from that of serving the master to that of serving a personal or some other end."

*Mittleman v. Lindsay-McMillan Co.,* 202 Wis. 577, 580, 232 N.W. 527, 528 (1930).

In view of the clear and well-defined "scope of employment" doctrine in Wisconsin, I fail to comprehend Judge Cudahy's reliance upon *State v. Beaudry*, 123 Wis.2d 40, 365 N.W.2d 593 (1985) ("*Beaudry* ") for the proposition that "acts of an employee were within the scope of ... employment where the acts were similar to those for which he had been hired and were made possible only by virtue of his role as employee, even though ... the acts were done solely for the private purpose of the employee." In *Beaudry*, the manager of the Village Green Tavern in Elkart Lake, Wisconsin allowed two friends to remain in the tavern and consume liquor after the 1:00 a.m. closing hour, in violation of Wis.Stat. §§ 125.68(4)(c), 125.11(1)(a) (1981–82). The Wisconsin Supreme Court held that Janet Beaudry, the co-owner and designated corporate agent for the tavern, was vicariously liable for the manager's conduct because "the jury could conclude that the tavern manager's conduct was sufficiently similar to the conduct authorized as to be within the scope of employment." *Id.* at 64, 365 N.W.2d at 604. In so holding, the Wisconsin Supreme Court acknowledged that the bar manager's testimony—including his ad-

mission that he was never authorized to keep the tavern open after hours and his admission that he was acting for his own independent purpose—supported Beaudry's position that the bar manager was acting outside his scope of employment. The Court concluded, however, that the bar manager's authority to act as he did was solely a question of credibility to be resolved by the jury. Thus, even though there was sufficient evidence to find that the bar manager was acting outside the scope of his employment, the Court deferred to the jury because:

> "[t]he credibility of the bar manager's testimony was a matter for the jury. *Braatz v. Continental Casualty Co.*, 272 Wis. 479, 487, 76 N.W.2d 303 (1956). The bar manager's testimony which supports the defendant's position that the manager was acting outside the scope of employment was based on a statement the bar manager gave defendant's counsel the night before trial. The jury may not have believed this testimony which was favorable to the defendant."

*Id.* Contrary to Judge Cudahy's assertion, the Wisconsin Supreme Court never expressly stated nor implied that conduct engaged in solely for an employee's own private purpose is conduct within the scope of employment as delineated in Wisconsin case law. Instead, the Wisconsin Supreme Court reaffirmed that under the "scope of employment" doctrine of Wisconsin law, as set forth in the Wisconsin pattern jury instructions:

> " 'A servant or agent is within the scope of his employment when he is performing work or rendering services he was hired to perform and render within the time and space limits of his authority and is actuated by a purpose in serving his employer in doing what he is doing.
>
> $*$ $*$ $*$ $*$ $*$ $*$
>
> A servant or agent is outside the scope of his employment when he deviates or steps aside from the prosecution of his master's business for the purpose of doing an act or rendering a service intended to accomplish an independent purpose

of his own, or for some other reason or purpose not related to the business of his employer.

> Such deviation or stepping aside from his employer's business may be momentary and slight, measured in terms of time and space, but if it involves a change of mental attitude in serving his personal interests, or the interests of another instead of his employer's, then his conduct falls outside the scope of his employment.' "

*Id.* at 65–66, 365 N.W.2d at 596. (quoting Wis.J.I.—Criminal 440 (1966)).

In the present case, the record reveals that the defendants clearly stepped aside from their duties as Sawyer County sheriff deputies and acted for the sole, unlawful, independent, and personal purpose of relieving themselves of criminal liability and removing themselves as suspects in the Spider Lake burglaries. Once the defendants became fearful that the Sawyer County sheriff would discover their participation in the Spider Lake burglaries, they embarked upon a scheme to frame Hibma for the burglaries. The defendants used the power and authority of their office to carry out this unlawful cover-up scheme, entrapping Hibma into stealing a handgun, placing Hibma under arrest, attempting to coerce a confession while undergoing drug withdrawal, denying his request for medical assistance, obtaining consent to search Hibma's residence, planting the evidence from the Spider Lake burglaries on Hibma's premises, and then knowingly, intentionally, and maliciously filing false statements with the Sawyer County Sheriff's Department, the Sawyer County District Attorney, and the Sawyer County newspaper, alleging that Hibma had committed the Spider Lake burglaries. The majority erroneously asserts in footnote 1 that "the deputies' participation in investigations, reporting to superiors, filing and paperwork, testifying at trial, etc. furthered the objectives of Sawyer County." It is absurd to even imagine that three deputy sheriffs who burglarize homes, file false investigative reports, file a false criminal complaint, file

false reports with their superiors, testify falsely in a state criminal proceeding, and frame an innocent member of the public, are furthering the objectives of Sawyer County. The majority's unexplained, conclusory statement finds no support in the record. The defendants freely admit that they acted for the sole purpose of "removing themselves as possible suspects for the criminal acts of burglary and theft." The defendants, in effect, concede that they "step[ped] aside from the prosecution of [their] master's business for the purpose of doing an act ... intended to accomplish an independent purpose of [their] own...." *Id.*

A thorough examination of the record reveals that each of the defendants' actions was a calculated step to protect their own interests and to prevent discovery of their participation in the Spider Lake burglaries. At no time were the defendants carrying out their duly sworn duties as sheriff deputies for Sawyer County when they violated Hibma's constitutional rights. Indeed, the Wisconsin Supreme Court has never suggested a line of reasoning that would allow a deputy sheriff who commits a house burglary for his own personal gain and then attempts to frame an innocent member of the public with the burglary, to be considered as performing acts within the scope of his employment. It is beyond dispute that a deputy sheriff who engages in such unlawful conduct is not "performing work or rendering services he was hired to perform and render within the time and space limits of his authority...." *Id.* In sum, the defendants completely abdicated their duties and responsibilities as deputy sheriffs, engaging in illegal activity for the sole purpose of removing themselves as suspects in the Spider Lake burglaries. The defendants' actions were clearly designed to serve their own personal interests and thus, under Wisconsin law, the defendants were at no time acting within the scope of their employment.

I add that given the broad construction of the phrase "under color of state law" for purposes of a section 1983 action and the narrow construction of the phrase "within

the scope of employment," a state agent may easily violate 42 U.S.C. § 1983 outside the scope of his employment. For example, in *Harris v. Harvey*, 605 F.2d 330 (7th Cir.1979), this court held that a state court judge who had committed "racially motivated acts" against the plaintiff was acting under color of state law for purposes of a section 1983 action but was not entitled to judicial immunity because his remarks were not part of the judicial function. 605 F.2d at 336–37. Similarly, in the present case, the defendants acted "under color of state law" when they deprived Hibma of his constitutional rights but at no time were the defendants' acts in good faith or a natural part or incident of their duties as sheriff deputies for Sawyer County.

The majority claims that the present case "falls squarely within the holding" of *Bell v. City of Milwaukee*, 536 F.Supp. 462 (E.D.Wis.1982), *aff'd in part, rev'd in part*, 746 F.2d 1205 (7th Cir.1984) ("*Bell*"). In *Bell*, the district court ruled that when Milwaukee police officer Grady shot Daniel Bell, planted a knife in Bell's hand to make it look as though Bell had threatened him, and then knowingly, intentionally, and maliciously covered-up his unlawful actions, he was acting within the scope of his employment for purposes of Wis.Stat. § 895.46. The court concluded that:

> "[w]hile Grady's actions were unquestionably designed to further his own objective of escaping punishment for his wrongdoing, they also were designed to further the objectives of his employment. He was performing his duties as a police officer but used quite improper methods of carrying out those duties."

*Id.* at 478. On appeal, this court did not directly address the issue of whether Officer Grady was acting within the scope of his employment for purposes of Wis.Stat. § 895.46, but the court did hold that under section 895.46 the City of Milwaukee had to indemnify Officer Grady for the punitive and compensatory damages arising out of the shooting and cover-up conspiracy. *Bell v. City of Milwaukee*, 746 F.2d 1205, 1271–72 (7th Cir.1984). I initially take issue with

the majority's bold assertion that the present case is "squarely within the holding" of *Bell*. In *Bell*, Officer Grady, for a brief period of time, acted within the course of his employment as a Milwaukee police officer when he stopped Bell for a routine automobile taillight violation. After Officer Grady shot and killed Bell, Grady clearly began to act for his own independent interest as he followed up the killing by planting a knife upon Bell's person and then covered-up his unlawful actions. Indeed, Officer Grady abandoned his original intent in investigating the defective taillight and departed so far from the purpose of his initial lawful contact with Bell that he practically vitiated the effect of such contact. In stark contrast, the record reveals that the defendants in this case had no initial lawful contact with Hibma; rather, as the defendants freely admit, the sole purpose of their unlawful actions and contact with Hibma was to conceal their involvement in the Spider Lake burglaries. From the very inception of their unlawful conspiracy to frame Hibma with the Spider Lake burglaries, the defendant deputy sheriffs "stepped aside from the business of [their] principal to accomplish an independent purpose of [their] own...." *Linden v. City Car Co.*, 239 Wis. at 239, 300 N.W. at 926.

In view of the majority's exclusive reliance upon *Bell* as a legal basis for holding Sawyer County liable for the damages assessed against the defendant deputy sheriffs, I am compelled to seriously question the district court's conclusion in *Bell* that Officer Grady's planting of the knife on Bell's person and his subsequent cover-up of the unlawful action were within the scope of his employment as a Milwaukee police officer. Officer Grady's scandalous and repugnant conduct, unlawfully planting the knife in Bell's hand and making it appear as though Bell was about to use forceful resistance, was clearly intended to absolve Grady of any wrongdoing. In this regard, Officer Grady clearly had "a change of mental attitude from that of serving the master to that of serving a personal ... end." *Mittleman v. Lindsay-*

*McMillan Co.*, 202 Wis. at 580, 232 N.W. at 528. I fail to understand how Officer Grady's actions were in good faith or were a "natural ... part or incident" of his duties as a Milwaukee police officer. *Cameron*, 102 Wis.2d at 456, 307 N.W.2d at 168. As I interpret the relevant Wisconsin case law, Officer Grady was not acting within the scope of his employment, and thus the City of Milwaukee should not have been liable, under Wis.Stat. § 895.46, for any damages assessed against Officer Grady for his unlawful planting of the knife in Bell's hand and his subsequent cover-up of the unlawful action. Indeed, in *Bell* the district court attempted to compensate the heirs of Bell's estate and to punish Officer Grady for the dastardly moral wrong that he committed but, in effect, the district court wrongfully punished the taxpayers of the City of Milwaukee. Similarly, in the present case the majority improperly punishes the taxpayers of Sawyer County, holding that the county is liable for $86,500 in damages because the defendant deputy sheriffs acted within the scope of their employment in framing Hibma for the Spider Lake burglaries that they had, in fact, committed. The majority's result contravenes the controlling Wisconsin case law, as well as sound public policy that deputy sheriffs who unlawfully act outside the scope of their employment for their own personal interest must be held personally responsible for any damages assessed against them.

The majority improperly seeks to redraft Wis.Stat. § 895.46 to provide that a municipality must bear the cost of any damages assessed against its officers or employees who act under color of state law. The majority's erroneous interpretation of Wis. Stat. § 895.46 completely disregards the Wisconsin legislature's intent to limit a municipality's liability to damages incurred by an officer or employee who is carrying out acts that are a "natural ... part or incident of the service contemplated." *Cameron*, 102 Wis.2d at 456, 307 N.W.2d at 168. In the present case the defendants' unlawful acts were not in furtherance of their duties

as Sawyer County deputy sheriffs; instead the defendants freely admit that the sole unlawful, independent, and personal purpose of their acts was to relieve themselves of criminal liability and to remove themselves as suspects in the Spider Lake burglaries. Accordingly, I agree with the district court that, as a matter of law, the defendants' actions were not within the scope of their employment and, as a result, Sawyer County is not liable, under Wis. Stat. § 895.46, for any of the damages assessed against the defendants.