Robert J. BENNETT and Patricia Ann Bennett, and Raymond C. Meyer, d/b/a Ray's Honey Farm, Plaintiffs-Appellants,

v.

The LARSEN COMPANY, a Wisconsin corporation, and Hartford Accident & Indemnity Company, an insurance corporation, and Ag-Aire, Inc., Defendants-Respondents.†

Court of Appeals

*No. 82–1461. Submitted on briefs May 2, 1983.—
Decided July 12, 1983.*
(Also reported in 338 N.W.2d 510.)

† Petition to review granted.

For the appellants the cause was submitted on the briefs of *Rabinovitz, Sonnenburg & Zelpe* of Sheboygan.

For the respondents The Larsen Company and Hartford Accident & Indemnity Company the cause was submitted on the brief of *Menn, Nelson, Sharratt, Teetaert & Beisenstein, Ltd.,* and *Joseph J. Beisenstein* of Appleton.

For respondent Ag-Aire, Inc. the cause was submitted on the brief of *Conklin & Adler, Ltd.,* of Chicago and *Gabert & Williams* of Appleton.

Before Foley, P.J., Dean and Cane, JJ.

CANE, J.    Robert and Patricia Bennett and Raymond Meyer (appellants) appeal a judgment entered after a jury verdict dismissing their complaint against The Larsen Company, Hartford Accident & Indemnity Company, and Ag-Aire, Inc. (respondents), for damages for the death of their honeybees allegedly caused by the respondents' negligent application of pesticides.    Appellants contend that the trial court erred in its jury instructions and that it should have changed the jury's verdict answers, or granted judgment notwithstanding the verdict or a new trial because of the erroneous instructions.    We affirm.

Appellants are Outagamie County beekeepers.    Larsen is a food processor that contracts with farmers to produce food for its canning operation in Hortonville.    Under the contract terms, Larsen assumes responsibility for pest control on the leased lands, which includes the decision to apply pesticides.

In 1977 and 1978, Larsen contracted with certain Outagamie County farms to grow sweet corn.    In both years, Larsen officials observed infestations of corn borers and earworms in cornfields covered by its contracts.    Larsen purchased the pesticides Sevin in 1977 and Lannate in 1978 to control these infestations.    In 1977, Ag-Aire aerially applied Sevin to Larsen's leased sweet corn fields.    Larsen's records indicate that Ag-Aire sprayed Sevin by helicopter on acres of sweet corn for Larsen on August 3, 4, 12, 13, and 23, 1977.

On August 13, 1977, Robert Bennett observed someone aerially spraying a sweet corn crop adjacent to his home and automobile business.    After the spraying, Bennett noticed that several bees in his home observation hive were dead.    He also suffered losses in his home production hives and in certain colonies at other locations.

In 1978, the Outagamie County Beekeepers Association formed a pesticide committee to gather and provide information concerning the use of pesticides and their

effect on bees. As a result of a committee meeting in February, 1978, a program was initiated whereby Outagamie County beekeepers could locate their beehives on plat maps, and those using pesticides could locate their fields on the maps. Carl Hanamann, chief fieldman for Larsen, subsequently received maps marked 1978. These maps indicated the townships where Outagamie County beekeepers, including the Bennetts and Meyer, had their beehives and the locations of the beehives. Hanamann also received a list of beekeepers, their addresses and telephone numbers, and the townships where they had their beehives in 1978.

On July 18, 1978, Hanamann telephoned Paula Jorgensen, chairperson of the pesticide committee, and informed her that Larsen would be spraying a pesticide on certain fields as soon as the weather cleared. Hanamann also called Jorgensen on July 20, 1978, and indicated when and where Larsen would apply the pesticide. After that call, Jorgensen contacted Bennett to inform him of the spraying because he had beehives in the areas to be sprayed. Jorgensen also contacted Meyer on July 20 for the same reason.

After the spraying, which was done by Ag-Aero, Inc.,[1] Bennett and Meyer inspected their colonies at various locations and observed damage to several beehives. The Bennetts and Meyer filed a complaint against the respondents, in which they alleged that the respondents' negligent application of pesticides caused damage to their beehives. The Bennetts sought damages for losses in-

[1] In 1977, Roy Reabe contracted with Larsen to apply pesticides to Larsen's sweet corn fields in Outagamie County. Reabe later contacted Lee Lesh, who had an interest in Ag-Aire, Inc., to do some of the spraying. In 1978, Lesh sold his interest in Ag-Aire and became a stockholder in a new corporation, Ag-Aero, Inc. Ag-Aero contracted with Larsen in 1978 to apply pesticides to its sweet corn fields.

curred in 1977 and 1978. Meyer sought damages for losses incurred in 1978. The jury did not find that Ag-Aire was negligent in its conduct of spraying on August 13, 1977, and it did not find that Larsen was negligent in its participation in the August 13 spraying. In addition, the jury did not find that Ag-Aero was negligent in its conduct of spraying on July 20–23, 1978, and it did not find that Larsen was negligent in its participation in the spraying operation during that period. Finally, the jury found that both Bennett and Meyer were negligent with regard to taking reasonable precautions to protect their property from damage from the July 20–23, 1978, spraying.

Appellants contend that the trial court should have instructed the jury that Wisconsin law requires aerial applicators of pesticides and those contracting for such services to spray according to label directions or they are negligent.[2] To support this assertion, appellants cite sec. 94.70(3)(g), Stats., which provides:

(3) No person may:

. . . .

(g) Use any pesticide in a manner inconsistent with its labeling except as authorized by the department.

Appellants argue that this and other statutory provisions and administrative regulations in effect in 1977–1978[3]

---

[2] In the instructions to the jury, the trial court stated:

In considering the question of negligence in regard to pesticide appliers, you should consider the manner and method in which the pesticide was applied to the fields in question, whether the pesticides drifted to adjacent property, and whether the pesticide was applied in accordance with the instructions contained upon its label.

[3] The additional authority appellants cite includes § 94.67(19), Stats., which defines "label"; § 94.67(21), Stats., which defines "labeling"; § 94.67(25), Stats., which defines "pesticide"; Wis. Admin. Code, § Ag 29.10(1), which provided, in part, "No person shall use, store, transport, or display pesticides contrary to label

establish a duty of care to their bees whether on or off the sprayed fields, and that a violation of the provisions is negligence per se.

Even if we agreed that the provisions appellants cite created some duty of care to their bees whether on or off the sprayed fields, we conclude that the trial court did not err in failing to so instruct the jury. A trial court generally should instruct the jury with due regard to the facts of the case. It is error for a court to give an instruction on an issue that has no support in the evidence. *Lutz v. Shelby Mutual Insurance Co.*, 70 Wis. 2d 743, 750, 225 N.W.2d 426, 431 (1975). The instruction appellants requested has no support in this case.

The 1977 label on Sevin, which Larsen and Ag-Aire used that year, contained the following warning:

BEE CAUTION: MAY KILL HONEYBEES IN SUBSTANTIAL NUMBERS. This product is highly toxic to bees exposed to direct treatment or residues on crops . . . .

Do not use when value of honeybees as pollinators is more important than insect control. Before applying, warn beekeepers to locate hives beyond bee flight range until one week after application or to take other equally effective precautions.

A reasonable construction of the warning that Sevin should not be used when the value of honeybees as pollinators is more important than insect control is that it is intended to apply to persons who want to use pesticides to control insect infestations but who also grow crops that

directions, or in a careless or reckless manner . . ."; and Wis. Admin. Code § Ag 29.10(6), which states, "No person shall dispose of or hold pesticides or their containers for disposal contrary to directions on the label or in a manner which may contaminate waters of the state or create a hazard to persons or property including fish or wildlife." Sections 29.10(1) and 29.10(6) were in effect from September 1, 1975, to March 31, 1982.

depend on bees for pollination. Testimony at trial indicated that sweet corn, to which Ag-Aire applied Sevin for Larsen in 1977, is self-pollinating. Several people also testified that in 1977, Larsen's cornfields had severe insect infestations capable of destroying its crops. Because Larsen did not depend on honeybees to pollinate its sweet corn and because insect control was a legitimate concern, neither Larsen nor Ag-Aire violated that part of the 1977 Sevin label.

The statement that beekeepers should be warned before the pesticide is applied could only be applicable in this case if Larsen or Ag-Aire knew in 1977 that the Bennetts and Meyer had beehives in the vicinity of the fields to be sprayed. The evidence does not indicate, however, that Larsen or Ag-Aire knew or reasonably should have known that the Bennetts and Meyer had beehives in the vicinity of the 1977 spraying, or the location of their beehives in relation to the fields Ag-Aire sprayed for Larsen that year. The pesticide committee was not formed until 1978, and there is no evidence that Hanamann had received any maps indicating the location of the Bennetts' and Meyer's beehives in 1977 when Ag-Aire sprayed that year.

The 1978 label on Lannate, which Larsen and Ag-Aire used in 1978, stated, in part:

This product is toxic to bees and should not be applied when bees are actively visiting the area. Apply late in evening or early morning where honey bees visit fields
. . . .

Meyer testified that some time in July, 1978, he saw a spray being aerially applied on a sweet corn field between 9 a.m. and 12 p.m. Meyer did not see who did the spraying, however. Jorgensen testified that on July 20, 1978, she observed aerial spraying of a sweet corn field at 2:45 p.m., but did not see who did the spraying. LeRoy Behm also

testified that in July, 1978, he observed a helicopter spray a sweet corn field between 9:30 and 10 a.m. He also was unable to identify who did the spraying.

When Agricultural Stabilization and Conservation Service (ASCS) inspectors inspected the Bennetts' and Meyer's beehives in August, 1978, they indicated in their reports that some of the damage may have been caused by Larsen spraying Lannate in fields near Meyer's damaged beehives. One inspector testified, however, that he partly relied on Paula Jorgensen's journal containing notations made after Hanamann's telephone calls to her to assist him in determining who had sprayed pesticides in that area in July. There is no indication that Jorgensen's journal reflected whether other canning companies or farmers in the area were also spraying pesticides at that time. The inspector also testified that he did not know whether some other canning companies leasing fields in Outagamie County had sprayed pesticides in July, 1978. Another inspector testified that he partly relied on information that Bennett provided to arrive at the spraying dates and the conclusion that the Bennetts' damages were caused by Lannate being applied to sweet corn fields.

Even if the evidence could support an inference that Ag-Aero was the applicator that Meyer, Jorgensen, and Behm observed spraying during time periods contrary to those listed on the label of the pesticide used, neither the Bennetts nor Meyer presented evidence indicating that any spraying in violation of the Lannate label caused their losses in 1978. There was testimony that the time pesticides are applied may be important because bees tend to forage in fields during a certain time period. There was also uncontroverted evidence, however, that Lannate has a toxic residue that remains in the sprayed fields from three to six days after the application. Even if the jury could reasonably have concluded that some of the appellants' injured bees actually were foraging in the fields

Ag-Aero sprayed for Larsen, it could only have speculated whether those bees were injured because Ag-Aero may have sprayed during mid-morning and mid-afternoon. It is just as likely that any bees injured while foraging in the sprayed fields were injured because they picked up a toxic residue while foraging days after the spray was applied and not because of the time of spraying.

Appellants argue that the aerial application of pesticides should be considered an ultrahazardous activity. They therefore assert that the trial court should have instructed the jury that aerial applicators of pesticides and those contracting for such services are strictly liable for property damage caused by the spraying.

Although courts in some jurisdictions have held that the aerial application of pesticides is an ultrahazardous activity rendering the landowner using the pesticide or the applicator strictly liable for damage resulting from the application,[4] others have rejected this view.[5] Several courts have concluded that a person employing or operating a plane for purposes of spraying poisonous pesticides must use due care, and should not spray under conditions that would indicate to a reasonable person that damage to a neighbor or his property would result.[6] Courts have also held that an owner or lessee of land may be liable for negligently spreading poisonous dusts and sprays and may not delegate the work of spraying a crop with poisonous pesticides to an independent contractor and avoid liability.[7]

---

[4] *See, e.g., Gotreaux v. Gary,* 94 So. 2d 293 (La. 1957); *Young v. Darter,* 363 P.2d 829 (Okla. 1961); *Loe v. Lenhardt,* 362 P.2d 312 (Ore. 1961).

[5] *See, e.g., Boroughs v. Joiner,* 337 So. 2d 340, 343 (Ala. 1976).

[6] *See, e.g., Lundberg v. Bolon,* 194 P.2d 454, 458 (Ariz. 1948); *Lawler v. Skelton,* 130 So.2d 565, 569 (Miss. 1961); *Mustion v. Ealy,* 266 N.W.2d 730, 734 (Neb. 1978).

[7] *See, e.g., Lawler,* 130 So.2d at 569.

Whether an activity could be considered ultrahazardous and potentially result in the imposition of strict liability requires a balancing of the utility of the challenged activity with the risk of harm if the activity miscarries. *See Loe v. Lenhardt,* 362 P.2d 312, 316 (Ore. 1961). The Restatement (Second) of Torts § 520 (1977), also lists factors to consider in determining whether an activity is abnormally dangerous. These include:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

We conclude that the trial court was correct in not instructing the jury that the respondents' pesticide use is an ultrahazardous activity and that the respondents would be strictly liable for damage caused by the applications. Larsen hired applicators to spray pesticides in order to control severe pest infestations on their crops and to promote healthy crop growth. Testimony at trial indicated that pesticide use for this purpose is common among several canning companies using farmland in Outagamie County.

Although aerial application of pesticides may produce some risk of harm to neighboring property, it appears that this risk may be reduced through the exercise of reasonable care in spraying, such as monitoring weather

and wind conditions to avoid the possibility of drift beyond the sprayed fields.[8] We therefore conclude that under the facts of this case, the value of pesticide use to those who depend on pesticides to prevent crop destruction outweighs the possible risk of harm from the pesticide use.

Appellants also contend that the trial court should have instructed the jury that aerial applicators of pesticides, and persons who contract for their services, owe a higher than ordinary duty of care to those whose property comes in contact with the pesticides, regardless of whether such contact occurs on or off the sprayed premises. The court instructed the jury that while no person has the right to deliberately or wantonly destroy the property of another, neither Larsen nor the pesticide applier has a duty to protect bees in the fields at the time the pesticide is applied, or bees who visit the fields after the spraying has been completed. The court also informed the jury that Larsen and the pesticide applier have a duty to exercise reasonable care in carrying out the spraying operations to protect people and property outside the area where the pesticide is applied from damage.

As previously noted, courts have held that one who aerially sprays crops with poisonous chemicals or pesticides in a manner that endangers another's property in the vicinity of the spraying may be liable for damages. If an animal procures poison while trespassing on the sprayed fields, some courts have held that the animal's owner cannot recover damages unless the poison was distributed wantonly, maliciously, or with deliberate intent to injure or destroy the animal.[9] In *Hopkins v.*

---

[8] Larsen also used pesticides prior to 1977 to control pest infestations. Neither the Bennetts nor Meyer indicated that they had suffered severe losses to their beehives before 1977.

[9] *See, e.g., Lenk v. Spezia*, 213 P.2d 47, 51 (Cal. Dist. Ct. App. 1949).

*Ravalli County Electric Coop., Inc.,* 395 P.2d 106 (Mont. 1964), however, the court held that a landowner who erected a fence on his property but left a strip open, and who knew that cattle had pastured on that strip for several years, had a duty to warn the cattle's owner of the spraying of a poisonous chemical he knew was dangerous to animals.

In this case, various persons testified that Hanamann was at the February, 1978, pesticide committee meeting during which certain Outagamie County beekeepers expressed concern about the effect of pesticides on their bees. There is evidence that in 1978, but prior to the July 20–23 spraying, Hanamann received maps indicating where the Bennetts, Meyer, and others had their beehives. Larsen therefore may have known or should have known the location of the Bennetts' and Meyer's beehives in 1978. In addition, Larsen may have known or should have known that because of the location of those beehives, some of the Bennetts' and Meyer's bees could be foraging in nearby cornfields at the time or shortly after Larsen planned to spray those fields between July 20-July 23, 1978. Hanamann also testified at trial that he knew that Lannate, which Ag-Aero applied for Larsen in 1978, is toxic to bees.

■

Even if what Larsen may have known or reasonably should have known prior to the July 20–23, 1978, spraying[10] imposed on it, as lessee of the lands sprayed, some

[10] As previously noted, the evidence does not suggest that Larsen knew or reasonably should have known the location of the Bennetts' and Meyer's beehives in 1977 in relation to the cornfields Ag-Aire sprayed for Larsen in 1977. Larsen therefore could not be expected to know in 1977 that some of the Bennetts' or Meyer's bees might be in the fields sprayed or could visit the fields after they were sprayed in 1977. Any duty of care created by the knowledge that an activity is dangerous to animals known to trespass in an area where the activity occurs would therefore not apply to Larsen in 1977.

duty of care to the Bennetts' and Meyer's bees that may have been on the sprayed fields or that may have visited the fields after the spraying, we conclude as a matter of law that Larsen satisfied any duty owned. It is undisputed that Hanamann called Paula Jorgensen on July 20, 1978, to warn her that Larsen was going to spray and where the spraying would occur. This ws done so that Jorgensen could contact beekeepers in the vicinity of the spraying, and was pursuant to a prior understanding reached at the pesticide committee meetings that such calls would enable the beekeepers to take precautions and monitor their beehives. It is also undisputed that Jorgensen promptly relayed the information to Robert Bennett and Meyer. Any additional duty Larsen may have owed to the Bennetts and Meyer or to their bees that were on the fields when they were sprayed or that visited the fields after they were sprayed during July 20–23, 1978, was therefore met by Hanamann's warning to Jorgensen, who then relayed the warning to Bennett and Meyer. *See Hopkins.*

Appellants finally contend that the trial court should have changed the jury's special verdict answers because there is insufficient evidence to support them and because of the allegedly erroneous jury instructions. Alternatively, appellants argue that the trial court should have granted them judgment notwithstanding the verdict or a new trial.

The test for determining whether a jury's answer should be changed is "whether there was *any credible evidence* which supported the jury's answer." *Giese v. Montgomery Ward,* No. 81–763, slip op. at 13 (Wis. Mar. 29, 1983), quoting *Home Savings Bank v. Gertenbach,* 270 Wis. 386, 392, 71 N.W.2d 347, 350, 72 N.W.2d 697 (1955). In addition, a trial court is not justified in setting aside a verdict and directing judgment if there

is credible evidence to support the jury's findings. *Giese,* at 13.

We conclude that, under the circumstances of this case, the trial court's jury instructions were not erroneous. We also conclude that there is sufficient evidence to support the jury's verdict answers. The trial court therefore properly refused to change the answers, or grant judgment notwithstanding the verdict or a new trial.

Bennett's testimony that in 1977 he felt a mist while observing aerial spraying on a neighboring field could be evidence of overspray, indicating negligence in applying the pesticide. Bennett did not see who applied the spray, however. He also testified that he became physically ill after the spraying. Other testimony indicated, however, that the amount of Sevin that may have drifted to the Bennetts' home probably would not produce physical illness in humans. Bennett testified that shortly after the 1977 spraying, he observed dead bees in his home observation hive. Other testimony concerning the toxic effect of Sevin revealed that it is slow-acting, and is unlikely to cause harm to bees immediately after it is sprayed. The credibility of witnesses and the weight to be given their testimony were for the jury to decide. *Shawver v. Roberts Corp.,* 90 Wis. 2d 672, 681, 280 N.W. 2d 226, 230 (1979). Based on the evidence presented, the jury could reasonably find that neither Larsen nor Ag-Aire negligently sprayed in 1977, or that any negligence did not cause the Bennetts' losses in 1977.

The jury could also conclude that there was insufficient evidence to support findings of negligence by Larsen and Ag-Aero for the July 20–23, 1978, spraying, or that any negligence caused the Bennetts' and Meyer's 1978 losses. Those who testified that they observed aerial sprayings of sweet corn fields in July, 1978, could not identify the

applicator. LeRoy Behm also testified that when he stood near the area he observed being sprayed, he felt no spray that could indicate drift or overspray.

Although the ASCS inspectors reported that some of the Bennetts' and Meyer's damages in 1978 were due to Larsen applying Lannate to sweet corn fields, one inspector testified that he partly relied on what Bennett told him for that information. The inspector who inspected the Bennetts' beehives approximately two weeks after Larsen's July 20–23 spraying also testified that some of the dead bees may have died very recently or were in the process of dying at the time of his inspection. The jury additionally heard evidence that Larsen was not the only canning company that applied Lannate in 1978. There was testimony that an applicator aerially sprayed Lannate on a pea field in Outagamie County for another canning company on July 19, 1978.

There is also evidence to support the jury's findings that Bennett and Meyer were negligent in failing to take reasonable precautions to protect their property from damage during the July 20–23, 1978, spraying. Both Bennett and Meyer testified that although they were notified of the July 20–23 spraying, they did nothing to protect their beehives because they believed any precautions they could have taken would have been useless. There was other testimony, however, indicating that precautions may be available to beekeepers to protect their beehives from damage when pesticides are being sprayed. Because Bennett and Meyer admitted that they took no precautions and because there was evidence that precautions were available, the jury could reasonably find that Bennett and Meyer were negligent in failing to take reasonable precautions.

*By the Court.*—Judgment affirmed.