Joyce OLSON, f/k/a Joyce Leick, Plaintiff-Respondent-Cross-Respondent,

v.

Dr. Patrick CONNERLY, Defendant-Respondent-Cross-Appellant, †

STATE of Wisconsin, Intervening Defendant-Appellant.

Court of Appeals

*No. 88–1444. Orally argued May 8, 1989.—Decided July 25, 1989.*

(Also reported in 445 N.W.2d 706.)

† Petition to review granted.

For intervening defendant-appellant there were briefs by *Donald J. Hanaway,* attorney general, and *David T. Flanagan,* assistant attorney general; the cause was argued by *David T. Flanagan,* assistant attorney general.

For plaintiff-respondent-cross-respondent there was a brief by *Cindra R. Carson* and *Hertel, Carson, White, Schilling & Barr, S.C.,* Eau Claire, and argument by *Cindra R. Carson.*

For defendant-respondent-cross-appellant there were briefs by *Eric J. Wahl* and *Wiley, Rasmus, Wahl, Colbert, Norsent & Cray, S.C.,* Eau Claire, and argument by *Eric J. Wahl.*

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J. The state appeals a judgment holding it liable for the malpractice of Dr. Patrick Connerly, a University of Wisconsin faculty member/physician, as the result of his sexual contact with one of his patients, Joyce Olson. Although the jury found that the sexual contact was negligent medical treatment, it also found that Connerly was not acting within the scope of his employment as a government physician.

The issues are whether: (1) Wisconsin includes intent to serve the master as an essential factor in determining scope of employment; (2) the jury verdict was inconsistent when it found that Connerly's sexual contact was medical treatment but that he acted outside the

scope of his employment; (3) Olson provided proof of physical injury to sustain a damage award for emotional distress.

The trial court, concluding that it had erroneously instructed the jury, changed the answer to the scope of employment question from "No" to "Yes" and granted judgment to Olson, reasoning that Connerly was within the scope of employment as a matter of law. The court also let stand the damage award. The judgment therefore requires the state to indemnify Connerly for the damages, his reasonable attorney fees, and costs under sec. 895.46, Stats.[1]

The state does not contest the jury's malpractice finding, but maintains that the instruction was correct and that there was credible evidence to support the jury finding that the sexual contact occurred outside the scope of Connerly's employment. Because we agree that the instruction was not error and that there is credible evidence to support the jury verdict, we reverse the trial court's decision and remand for reinstatement of the jury's negative answer and entry of judgment in favor of the state.

Connerly cross-appeals the trial court's denial of his motions for dismissal, directed verdict, and judgment notwithstanding the verdict on grounds that Olson's claim was for negligent infliction of emotional distress and lacked manifestations of physical injury. Because Olson sufficiently proved a physical illness, Connerly's cross-appeal is dismissed.

---

[1] Section 895.46 provides in part: "If the defendant . . . is a public officer or employe and is proceeded against in an official capacity . . . and the jury . . . finds that the defendant was acting within the scope of employment, the judgment as to damages and costs . . . shall be paid by the state . . .."

This malpractice action arose from the following circumstances. The Eau Claire Family Medicine Clinic is a health care facility that houses a family practice program used as a teaching device by the University of Wisconsin Medical School. Connerly was a physician and member of the faculty assigned to the clinic to provide care to patients and to teach resident physicians. Olson was employed as a medical assistant at the clinic, and Connerly was both her supervisor and her personal physician. Olson also regularly counseled with an independent therapist because she was a victim of child sexual abuse, rape, alcoholism, and chemical dependency. After Olson experienced difficulty keeping insurance coverage for the outside therapy, Connerly, who allegedly told Olson he had a special interest in the subject, began providing sexual counseling in March of 1985.

Olson's testimony reveals a gradual blending of counseling and personal behavior by Connerly. Although he provided routine counseling on a number of occasions, during the spring of 1985 the parties also met with increasing frequency to discuss social matters of mutual interest. These included meetings at an after-hours exercise class, lunch hours spent at a city park, and eventually meetings at Olson's home. Connerly made suggestive remarks about Olson's attractive appearance, and eventually he kissed her, expressed his sexual desire for her, and arranged to meet her at her home on weekends, where he proposed marriage although both were still married at the time. On one occasion, he talked on the telephone about "female sexual response," eliciting her erotic responses to his statements about caressing and kissing "every part of [her] body." He told her this was what a sex therapist would do. Eventually, Connerly engaged in several instances of sexual contact and later in sexual intercourse, each time at Olson's home. Olson

668

testified that she believed Connerly intended the sexual contact to be therapeutic, while Connerly testified that his sexual relationship with Olson was a personal matter and he never intended the sexual contact to be counseling or medical care. According to the clinic director, Dr. John Kludt, staff physicians were not prohibited from moonlighting, but any income derived from the practice of medicine was to be turned over to the practice plan. Connerly did not submit a bill for the incidents of sexual contact. The parties disputed the reason for the absence of clinic records of some of the treatment sessions; Olson said it was agreed not to record them to avoid embarrassing her when other clinic employees typed and filed medical charts; Connerly said he did not record what he viewed as social matters.

Olson filed a sexual harassment complaint, and the clinic director undertook an immediate investigation. Upon concluding that there was substance to the allegation, he compelled Connerly's resignation. This action followed. The jury found Connerly guilty of negligent medical malpractice, apportioned negligence 65% to Connerly and 35% to Olson, found that Connerly acted outside the scope of his employment at the clinic, and awarded $46,500 in damages for past and future pain and suffering and past medical and hospital expenses.

At the hearing on motions after verdict, the court concluded that it had erroneously instructed the jury on scope of employment and changed the jury's answer to the question from "No" to "Yes." In doing so, the court concluded that recent case law had eliminated intent to serve the master as a necessary element in scope of employment cases. The court then reasoned that because the jury found that Connerly was treating Olson as a patient when the sexual contact occurred, as a state-

employed physician he was acting within the scope of his employment as a matter of law.

We conclude that intent to serve the master remains a necessary consideration in scope cases, that the jury instruction was not in error, and that credible evidence supports the jury's answers to both the treatment and scope issues. We also approve the damage award.

## THE JURY INSTRUCTIONS

We note first that the jury was not instructed on what constitutes "treatment," nor do the parties dispute the jury's verdict in this regard. We therefore accept as valid their finding on this issue.[2]

The court instructed the jury on the scope issue, essentially incorporating portions of Wis J I—Civil 4035 (1966), and added the emphasized language from *Cameron v. City of Milwaukee,* 102 Wis. 2d 448, 456, 307 N.W.2d 164, 168 (1981):

> A person is within the scope of his employment when he is performing work or rendering services he was engaged to perform and render within the time and space limits of his authority, and is actuated by a purpose to serve his employer in doing what he is doing. The test is whether the person has stepped aside from the business of his employer to accomplish an independent purpose of his own, or whether he was actuated by an intent to carry out his employment and to serve his employer.

---

[2] Section 448.01(9)(a), Stats., defines "Practice of medicine and surgery" for the purposes of licensing and regulation of medical practices as follows:

> (a)  To examine into the fact, condition or cause of human health or disease, or to treat, operate, prescribe or advise for the same, by any means . . ..

*Not every act which an employe may do while he is in the place appointed for the service or during the time in which he is engaged in the performance can be deemed to be within the scope of the employment or within the scope of the authority. The test lies deeper than that; it inheres in the relation which the act done bears to the employment. The act cannot be deemed to be within the course of the employment unless upon looking at it it can be fairly said to be a natural, not disconnected, and not extraordinary part or incident of the service contemplated.* The scope of employment includes those acts which are so closely connected with what the person is employed to do, and so fairly and reasonably identical to it, that they may be regarded as methods, even though quite improper ones, . . . of carrying out the objectives of the employment.

██

"The trial court has discretion in instructing the jury as to matters of emphasis, choice of language, and detail or brevity so long as it fully and fairly informs the jury of the rules and principles of law applicable to the case." *Webb v. Wisconsin Southern Gas Co.,* 27 Wis. 2d 343, 350-51, 134 N.W.2d 407, 412 (1965).

A long line of Wisconsin cases establishes the legitimacy of intent to serve the master as a factor in scope cases. While *Cameron* does not mention the intent factor, it has been noted that *Cameron* "was not an attempt to set forth a definitive standard under which to determine whether an employee was acting within the scope of his employment." *Desotelle v. Continental Cas. Co.,* 136 Wis. 2d 13, 26 n. 2, 400 N.W.2d 524, 529 n. 2 (Ct. App. 1986).

*Desotelle's* observation about *Cameron* is strengthened by an examination of *Scott v. Min-Aqua Bats Water Ski Club, Inc.,* 79 Wis. 2d 316, 255 N.W.2d 536

(1977), the source of the language from *Cameron. Min-Aqua Bats* states: "Conduct of a servant is not within the scope of employment if it is . . . too little actuated by a purpose to serve the master." *Id.* at 321, 255 N.W.2d at 538.

Another recent decision, *State v. Beaudry,* 123 Wis. 2d 40, 365 N.W.2d 593 (1985), affirmed a jury verdict in a criminal case holding that a tavern manager was acting within the scope of his employment when he gave away his employer's liquor to friends in an after-hours party at the bar without the knowledge or consent of the owner. The *Beaudry* court approved the jury instruction given:

> *A servant* or agent *is outside the scope of his employment when* he deviates or steps aside from the prosecution of his master's business for the purpose of *doing an act* or rendering a service *intended to accomplish an independent purpose of his own,* or for some other reason or purpose not related to the business of his employer.
>
> *Such deviation* or stepping aside from his employer's business may be momentary and slight, measured in terms of time and space, but *if it involves a change of mental attitude in serving his personal interests,* or the interests of another *instead of his employer's,* then his conduct *falls outside* the scope of his employment.

*Id.* at 47, 365 N.W.2d at 596 (quoting Wis J I—Criminal 440 (1966)) (emphasis supplied).

Justice Ceci, dissenting in *Beaudry,* concluded that the undisputed evidence showed that the manager's acts "were too little actuated by a purpose to serve the [master]." *Id.* at 67, 365 N.W.2d at 605 (Ceci, J., dissenting). Thus, the court unanimously accepted the intent factor and split only over its application to the facts.

Connerly relies primarily upon two decisions of the Seventh Circuit Court of Appeals to support his claim that intent to serve the master is no longer valid Wisconsin law. *Hibma v. Odegaard,* 769 F.2d 1147 (7th Cir. 1985), reinstated a jury verdict finding that Sawyer County deputy sheriffs were within the scope of their employment when they framed the plaintiff for burglaries the deputies themselves had committed. The federal trial court had given a tailored version of Wis J I—Civil 4035. In reversing the trial court's decision to set aside the verdict favorable to the plaintiff, the court of appeals stated:

> While the deputies' actions were unquestionably designed to further their own objectives of escaping punishment for their own wrongdoing, they also were designed to further the objectives of Sawyer County.
>
> . . . *Cameron* and *Bell* [536 F. Supp. 462 (E.D. Wis. 1982)] recognize that sec. 895.46 may require indemnification for actions which are not intended to benefit the employer when those actions further the objectives of the employment.

*Hibma,* 769 F.2d at 1153. The dissent, drawing on language from *Beaudry* noted that the Wisconsin Supreme Court had reaffirmed the scope of employment doctrine as set forth in the Wisconsin pattern jury instructions.

Another federal decision, *Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir. 1984), upheld the district court's decision finding a policeman within the scope of employment under sec. 895.46, Stats., when he planted a knife in the hands of a shooting victim and then gave false testimony in order to justify the shooting as self-defense. Whether or not the facts of *Bell* are consistent with the intent requirement, the court of appeals tacitly approved the district court finding that "[w]hile [the officer's]

actions were unquestionably designed to further his own objective of escaping punishment for his wrongdoing, they also were designed to further the objectives of his employment." *Bell,* 536 F. Supp. at 478.

Neither *Hibma* nor *Bell* expounds upon the difference between "furthering the objectives of the employment," a factor those cases found necessary, and "intending to benefit the employer," a factor they seem to discard. Perhaps *Hibma* and *Bell* cannot be reconciled with decisions of the Wisconsin Supreme Court. In cases not involving federal questions, as where a state statute is construed, state courts are not required to follow federal decisions. *Weber v. John Hancock Mut. Life Ins. Co.,* 267 Wis. 647, 654, 66 N.W.2d 672, 676 (1954). To the extent that those cases may be read to totally eliminate the servant's state of mind, we decline to follow them here.

## CONSISTENT VERDICT

An inconsistent verdict is a term used in describing jury answers that are logically repugnant to one another. *Fondell v. Lucky Stores, Inc.,* 85 Wis. 2d 220, 228, 270 N.W.2d 205, 210 (1978). The test for determining whether a jury answer should be changed is whether there was any credible evidence to support it, and the trial court is not justified in setting aside a verdict and directing judgment if there is credible evidence to support the jury's finding. *Bennett v. Larsen Co.,* 114 Wis. 2d 265, 278–79, 338 N.W.2d 510, 517 (1983), *rev'd on other grounds,* 118 Wis. 2d 681, 348 N.W.2d 540 (1984). The court must view the evidence in the light most favorable to sustain the verdict. *Smith v. Koch,* 247 Wis. 551, 554, 20 N.W.2d 566, 567 (1945). In light of the

evidence and several factors that bear on scope of employment, we conclude that the verdict was not inconsistent when it found the medical treatment was outside the scope of employment.

Based on the clinic director's testimony, the jury may have reasoned that Connerly was moonlighting and charged no fee when he treated Olson at her home. Even without the director's testimony, there is support in the law to find that Connerly acted outside the scope of employment, even if his treatment was performed as a clinic staff activity. Restatement (Second) of Agency, sec. 229 (1958), provides:

> To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. In determining whether . . . the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:
>
> (a) whether . . . the act is one commonly done by such servants;
>
> (b) the time, place and purpose of the act;
>
> . . ..
>
> (f) whether . . . the master has reason to expect that such an act will be done;
>
> (g) the similarity in quality of the act done to the act authorized;
>
> . . ..
>
> (i) the extent of departure from the normal method of accomplishing an authorized result; and
>
> (j) whether . . . the act is seriously criminal.

### (a)  Acts Commonly Done by Such Servants

There was direct evidence that Connerly's acts were not commonly done by physicians. An expert testified that any reasonable physician would know that sexual contact could not be a part of medical care. Other experts testified that sexual contact could not be done in the context of counseling or medical care and that any reasonable physician would know that. Further, a jury may take into account matters of its common knowledge and experience in the affairs of life. *State v. Lossman,* 118 Wis. 2d 526, 544, 348 N.W.2d 159, 168 (1984). Thus, the jury could conclude that Connerly's acts were outside ordinary employment practices.

### (b)  Time, Place and Purpose of the Acts

The sexual contacts took place on weekends, at Olson's home, and obviously were at least in part for personal gratification.

### (f)  The Master's Reasonable Expectations

The clinic director testified that he was surprised at Connerly's behavior. The fact that Connerly was promptly forced to resign is evidence of the absence of an expectation by the government that sexual contact would occur.

### (g) and (i)  Similarity of Quality of Conduct and Departure from Normal Methods

Although frank discussions of sexual matters may be appropriate counseling, sexual contact or intercourse may be viewed as a qualitative departure from authorized conduct.

676

### (j) Criminal Nature of the Acts

Sexual intercourse with a married person remains a felony in Wisconsin. *See* sec. 944.16, Stats.

The fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business. Restatement (Second) of Agency, sec. 236, comment b (1958).

In summary, although Connerly may have provided treatment, the fact that it was not a common practice, was done during normal leisure hours at the patient's home, partially for personal pleasure, was unexpected, departed from normal methods, was criminal and could be construed as outrageous conduct lends a basis in the credible evidence to support the jury verdict.

### CROSS-APPEAL

The parties spend considerable time debating whether Olson proved any physical injury with which to support her claim for emotional harm. When the tortfeasor's conduct causes bodily harm for which he is liable, he is also liable for mental distress. *Brantner v. Jenson,* 121 Wis. 2d 658, 663, 360 N.W.2d 529, 532 (1985) Conversely, the supreme court has been reluctant to allow recovery for emotional distress in the absence of accompanying physical injury for fear of a flood of fraudulent claims. *Garrett v. City of New Berlin,* 122 Wis. 2d 223, 234–35, 362 N.W.2d 137, 143 (1985). The requirement of physical injury has drawn strong criticism. *Id.* at

239–43, 362 N.W.2d at 145–47 (Heffernan, C.J., concurring).

The court has carved out exceptions to the requirement—where the distress is the result of intentional conduct, *id.* at 235, 362 N.W.2d at 143, or where the act, by its nature, has the special likelihood of causing real and severe emotional distress. *Id.* at 235, 362 N.W.2d at 144.

We need not decide whether Connerly's conduct falls within the exceptions, that is, whether the sexual contact was "intentional conduct" even though the formal accusation was negligent malpractice, or whether the nature of his actions was exceptional enough to eliminate the need for physical injury. Instead, the victim herself described "panic attacks." Olson described extreme pain in her abdomen connected with her recollection of Connerly's actions. *Garrett* found the victim's own description of physical manifestations a sufficient evidentiary basis to deny summary judgment. *Id.* at 236, 362 N.W.2d at 144.

Olson's claims were corroborated by the opinions of her psychologist and her psychiatrist. The former noted Olson's description: "She breaks out in a sweat. Her face turns deep red. She gasps for breath. She grabs around her waist and gives the impression that she is not going to get another breath and then she has a kind of gagging reflex." While it is true that these symptoms were not observed by the experts, *Garrett* does not require direct evidence corroborating the physical injury. We conclude that the trial court correctly denied the motion to dismiss for lack of evidence.

*By the Court.*—Judgment affirmed in part, reversed in part, and cause remanded with directions. Costs to the state of Wisconsin, intervening-appellant.

MYSE, J. (dissenting). I dissent from that portion of the majority opinion addressing the issue of the scope of Dr. Connerly's employment. The majority has correctly cited factors enunciated in a variety of cases discussing the scope of employment issue. In doing so it has also exposed a whole line of both federal and state cases unexplained and unexplainable in light of those factors.

While the subjective intent to further the employer's interests is a factor recited as necessary to find the employee's act in the scope of employment, the courts' decisions in *Hibma v. Odegaard,* 769 F.2d 1147 (7th Cir. 1985), *Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir. 1984), and *State v. Beaudry,* 123 Wis. 2d 40, 365 N.W.2d 593 (1985), belie such pronouncements. Neither the police planting a weapon on a victim and falsifying their incident report, as in *Bell,* nor sheriff's deputies committing a series of burglaries and framing a third party, as in *Hibma,* can by any stretch of the imagination be regarded as furthering their employers' interests. Yet, in each case, the court determined that this conduct was within the scope of employment and held the employer liable for the acts of its employee. A bartender's acts in gratuitously furnishing his employer's liquor and beer to his friends after hours can also hardly be said to benefit the employer. Yet in *Beaudry,* this conduct was found to be within the scope of the bartender's employment.

It is our responsibility to reconcile the cases that have addressed this issue so as to provide a clear and understandable scope of employment doctrine. A clear rule is necessary so that all parties, employers, and

679

potential victims of employee misconduct may take appropriate steps to protect themselves from loss.

I discern only one way to reconcile the inconsistent and contradictory line of cases on this issue. The Restatement (Second) of Agency, sec. 219(2) (1958), provides:

> A master is not subject to liability for the torts of his servants acting outside the scope of their employment unless:
>
> . . ..
> (d)   the servant purported to act or speak on behalf of the principal and there was reliance upon apparent authority, *or he was aided in accomplishing the tort by the existence of the agency relation.* (Emphasis supplied.)

Thus, the Restatement suggests that an exception to the general rule that an employer is not liable for the acts of his employee outside the scope of employment exists when the employer has vested the employee with the unique means or ability to engage in misconduct. While no Wisconsin cases have cited this provision, other courts have applied it where an employee, by virtue of the nature of his position and his employment relationship, was placed in a position where his employment aided him or facilitated him in accomplishing the tortious act. *See, e.g., North v. Madison Area Ass'n for Retarded Citizens,* 844 F.2d 401, 407 (7th Cir. 1988); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1418 (10th Cir. 1987); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1559 (11th Cir. 1987); *Graves v. Wayne County,* 333 N.W.2d 740, 743 (Mich. App. 1983); *McCann v. Michigan Dept. of Mental Health,* 247 N.W.2d 521, 524 (Mich. 1976).

Whether this doctrine is regarded as an exception to the general scope of employment rule or serves to remove the requirement that the employee intend to benefit the employer's interests at the time he engages in misconduct is irrelevant. The principle that an employer who vests his employee with the unique means to engage in misconduct, resulting in injury to another, is sufficient to impose liability upon the employer.

This rule is narrow in its application and does not operate to impose general liability upon all employers. For example, I do not suggest that a city is liable for all of the misconduct of its policemen merely because it furnishes them with a uniform, badge, and weapon as symbols of their office. *See Barnes v. Costle*, 561 F.2d 983, 996 (D.C. Cir. 1977) (MacKinnon, J., concurring). However, a police officer's employer who places the officer in a jewelry store, where the officer is given the combination to the jewelry store's safe in an effort to apprehend a potential burglar, would be liable if the officer uses this special knowledge or opportunity to commit criminal acts even though he acts only to benefit himself. *Id.*

I reach this conclusion for a variety of reasons. First, it seems to accurately reflect the law in Wisconsin even though such a principle has not been articulated. There is no other way to explain the results in *Bell, Hibma,* or *Beaudry,* and reconcile them with other Wisconsin cases unless there is either an exception to the general rule of nonliability of the employer for the acts of his employee done outside the scope of his employment, or the requirement that the employee intend to serve his employer's interest does not exist when special circumstances are created by the employer. Furthermore, this principle is also in accord with the Restatement position.

Second, the scope of employment issue arises in a variety of different settings, and I question the validity of defining scope of employment differently depending on the context in which the issue arises. For example, in the detour versus deviation cases, an employer is not liable for an employee's acts during a substantial detour for purely personal reasons. *Finsland v. Phillips Petroleum Co.,* 57 Wis. 2d 267, 273-74, 204 N.W.2d 1, 4-5 (1973). Thus, a minor detour, even for purely personal reasons, would not render the employee's acts outside the scope of employment. In contrast, under the majority's holding, as long as the employee acts for purely personal reasons and without intending to benefit the employer, his actions are outside the scope of employment.

Another example is in sexual harassment cases, where liability may be imposed on the employer for an employee's act of harassing another employee. It is certainly true that no employer's interests are being served when a supervisor sexually harasses another employee. But even in cases where the plaintiff proceeds on a theory that the supervisor's actions create a "hostile environment," and so are discriminatory, the Supreme Court has held that the absence of notice to an employer does not necessarily insulate that employer from liability. *Meritor Savings Bank FSB v. Vinson,* 106 S. Ct. 2399 (1986). In a four-justice concurrence, Justice Marshall urges that:

> [T]he act of a supervisory employee or agent [should be] imputed to the employer. Thus, for example, when a supervisor discriminatorily fires or refuses to promote a black employee, that act is, without more, considered the act of the employer. The courts do not stop to consider whether . . . the supervisor had actual authority to act as he did.

*Id.* at 2410 (Marshall, J., concurring) (footnote omitted).

This liability extends to the employer because the supervisor has apparent authority to behave in a discriminatory manner toward the employees he or she supervises. *See id.* Courts have upheld employer liability in these cases even though defendants have argued that "sexual harassment is an intentional act done for private gratification." *Horn v. Duke Homes,* 755 F.2d 599, 604 (7th Cir. 1985). While the *Horn* court noted that Title VII supports a public policy determination of strict employer liability in cases of sexual discrimination, it also noted in dicta that the common-law of agency could be seen to support such a determination, since "by delegating power to [the supervisor] the 'employer' and [the supervisor] essentially merged; as long as the tort complained of was caused by the exercise of his supervisory power, [he] should be deemed acting within the scope of his employment, and the employer should be held liable for the tort." *Id.* at 605.

Liability imputed to the employer for the employee's negligent or intentional misconduct in both the deviation and the sexual harassment settings is the result of social policy considerations. Courts have concluded that society's interests are best served by not insulating the employer from liability for the acts of the employee merely because the employee is engaged in a minor deviation or deliberate acts of sexual harassment for "purely personal" reasons. In those cases, we would not accept an employer's argument that it is not liable for his employee's acts of speeding because he was not permitted to speed under the employer's rules, nor would we permit an employer to escape liability by claiming that sexual harassment is against company rules. These are but two examples where liability is imposed on the employer, not because the employer benefited from the

employee's acts of negligence or misconduct, but because the employer had the power to vest the employee with the unique opportunity or means to engage in such misconduct.

This rule is consistent with the requirements of public policy and the needs of this state's citizens. An employer can by prudent hiring practices and the bonding of employees protect against personal loss. The imposition of liability on an employer in a limited way based upon the employer's affirmative conduct of vesting his employee with special power, authority, or opportunity to commit the misconduct is preferable to potentially placing the burden of the loss on an innocent victim who has been victimized because the employer has vested his employee with this unique means or opportunity.

Dr. Connerly was vested by his employer with the ability to render medical treatment to patients of the clinic, including clinic employees. His decision to engage in sexual therapy for which he was to some extent compensated by the patient's health insurer permitted him to engage in sexual conduct by virtue of the patient's dependent status in the therapist-patient relationship. That his intimate conversations and sexual touchings ultimately led to sexual intercourse with a patient seems a natural and known danger to the employer, so that it must either protect itself by limiting the availability of such therapy through the clinic or adequately supervising the therapist's conduct to protect against such events.

In the absence of taking these affirmative steps and because the therapist-patient relationship is so uniquely vulnerable to such overreachings, it is appropriate that the employer may be found liable for Dr. Connerly's misconduct. At the very least, the facts of this case raise

a jury question involving these issues, and an appropriate instruction should be given to the jury on the issue of scope of employment so that the jury fully understands that in the absence of a finding that Dr. Connerly's acts were intended to further his employer's best interests, liability on the part of the employer may nonetheless result if the jury finds Dr. Connerly's misconduct is uniquely attributable to his role as an employee of the clinic.